## THE LAUNDRY LICENSE CASE.

### *In re* WAN YIN.

*(District Court, D. Oregon.* January 29, 1885.)

1. CITY OF PORTLAND—POWER TO REGULATE.
   The power granted to the city of Portland "to regulate" wash-houses in-cludes the power "to license" as a means to that end; but it does not include the power to tax the business.

2. SAME—LICENSE FEE.
   The power "to license" as a means of regulating a business implies the power to charge a fee therefor sufficient to defray the expense of issuing the license, and to compensate the city for any expense incurred in maintaining such reg-ulation.

3. SAME—WHEN DEEMED A TAX.
   Whenever it is manifest that the fee for the license is substantially in excess of what it should be, it will be considered a tax, and the ordinance imposing it held void.

4. SAME—CASE IN JUDGMENT.
   The council of Portland was authorized "to regulate" wash-houses, and-thereupon ordained that the proprietor of such a house should take out a license quarterly, and pay therefor the sum of five dollars, or twenty dollars a year, and in default thereof should be liable to fine and imprisonment. *Held,* that, while the council had power to require the license as a means of regulating the-business, the sum charged therefor was manifestly so far in excess of what was necessary or proper for that purpose that it must be considered a tax, and the ordinance imposing it is therefore so far void.

5. JURISDICTION OF NATIONAL COURTS IN CASE OF IMPRISONMENT BY A STATE WITHOUT DUE PROCESS OF LAW.
   Grounds of it stated, and reflections thereon.

On *Habeas Corpus.*

*W. Scott Beebe,* for petitioner.

*A. H. Tanner,* for respondent.

DEADY, J.   The act incorporating the city of Portland, approved October 24, 1882, provides that the council has power and authority "to control and regulate slaughter-houses, wash-houses, and public laundries, and provide for their exclusion from the city limits or from any part thereof."   On December 4, 1884, the council passed an or-dinance, No. 4,448, "to license and regulate wash-houses and public laundries."   This ordinance declares every "house, building, or place which is open to the public as a laundry or wash-house," to be "a pub-lic laundry or wash-house;" and requires the "proprietor or manager" thereof, (1) to keep a written register of the receipt and return of clothes washed therein; (2) to keep the premises in a good sanitary condition, and connected with a sewer or cess-pool for the purpose of drainage; and (3) to pay "a quarterly license of $5."   Any person convicted of a violation of the ordinance shall be punished by a fine of from $5 to $50, or be imprisoned from 2 to 25 days; and the chief of police is required "to supervise and control the due and proper ad-ministration and enforcement" of the ordinance.   On January 16th,.

the petitioner, Wan Yin, who is the proprietor of a wash-house in Portland, refused to pay the quarterly license of five dollars when demanded by the police, and on January 20th was on that account convicted of a violation of the ordinance in the police court, and sentenced to pay a fine of $15 therefor, and in default of payment thereof was committed to the city jail for seven days. The petitioner sued out a writ of *habeas corpus* to be delivered from the imprisonment. The return of the chief of police, S. B. Parrish, contains the facts above stated, to which there was a demurrer by the petitioner.

On the argument counsel for the petitioner contended that the power "to regulate" laundries did not include the power "to license" the same; and if this were otherwise, that the power "to license" does not include the power "to tax," but only the right to charge a reasonable fee for issuing the same, and insisted that a fee of five dollars a quarter for a license to keep a wash-house is manifestly a mere pretense for imposing an onerous tax on the business. On the contrary, counsel for the respondent contends that the power "to regulate" includes the power "to license," and while he admits that it does not include the power "to tax," he insists that the sum required of the petitioner is not a tax but only a license fee, and that the judgment or action of the council in fixing the amount of such fee is not open to inquiry or question in the courts. Counsel also contends that if the power "to regulate" a wash-house, contained in subdivision 23 aforesaid, does not include the power "to license" the same, then such power is given by subdivision 37 of the same section, which authorizes the council "to license and regulate all such callings, trades, and employments" not prohibited by law, "as the public good may require;" and that even the power "to tax" the business of keeping a wash-house is contained in the last clause of subdivision 3 of said section which authorizes the council "to license, tax, regulate, and restrain all offensive trades and occupations."

In support of the proposition that the power to regulate a wash-house does not include the power "to license," counsel for the petitioner cites *Burlington* v. *Bumgardner*, 42 Iowa, 673; *Com.* v. *Stodder*, 2 Cush. 562; *St. Paul* v. *Traeger*, 25 Minn. 248; *Corvallis* v. *Carlile*, 10 Or. 139; *Dunham* v. *Rochester*, 5 Cow. 464; *Barling* v. *West*, 29 Wis. 314; Dill. Mun. Corp. § 361. While counsel for the respondents cites to the contrary *Burlington* v. *Lawrence*, 42 Iowa, 681; *Chicago P. & P. Co.* v. *Chicago*, 88 Ill. 221; *State* v. *Clarke*, 54 Mo. 17; *Welch* v. *Hotchkiss*, 39 Conn. 140; *Cincinnati* v. *Buckingham*, 10 Ohio, 527; Dill. Mun. Corp. § 91. Some of these authorities are flatly contradictory of others on this point, but the difference in the conclusion reached in the most of the cases is largely attributable to a difference in the circumstances.

The words "to control" and "to regulate," *ex vi termini*, imply to restrain, to check, to rule and direct. And, in my judgment, the

power to do either of these implies the right to license, as a convenient and proper means to that end. A license is merely a permission to do what is unlawful at common law, or is made so by some statute or ordinance, including the one authorizing or requiring the license. By this means the persons or occupations to be regulated are located and identified, and brought within the observation of the municipal authorities, so that whatever regulations are made concerning them may be the more easily and certainly enforced, including the giving of security for their observance before even the license is issued. The authority of the national government, like that of a municipal corporation, is limited to the powers expressly granted in the constitution, and such implied powers as may be necessary and convenient to the due execution of the former. And yet, under the power "to regulate" commerce, congress may and does provide for licensing the instrumentalities thereof, as vessels, pilots, engineers, Indian traders, and the like. *License Tax Cases*, 5 Wall. 470.

When an express authority to license is given, it may be a question whether it is intended for the purpose of revenue or regulation. But as a municipal corporation has no authority to impose a tax otherwise than in pursuance of an express grant of power to that effect, or a clear and necessary implication from an express grant, a power to license should be used only for regulation, unless there is something in the language of the grant or the circumstances of the case clearly indicating that it was also intended to be used for the purpose of revenue. Cooley, Tax'n, 408. But where, as in this case, the power to license is not expressly given, but only implied as a means of regulating the subject, it cannot be used for anything else; in other words, while the power to license may be inferred from the power to regulate, the power to tax cannot; and this is candidly admitted by the learned counsel for the respondent. It follows that if the sum required of the petitioner by this ordinance is intended for revenue, and not merely regulation, the same is so far void. A fee may be required for a license issued merely as a means of regulation, but the amount must not be more than is necessary to cover the cost of issuing the license and the incidental expenses attending the regulation of the business. But the presumption is that the fee prescribed is reasonable, unless the contrary plainly appears. Cooley, Tax'n, 408–410; Dill. Mun. Corp. (3d Ed.) § 358.

The conclusion already reached, that the power "to regulate" includes the "power to license," makes it unnecessary to consider whether a license could be required of the keeper of a wash-house under the general language of said subdivision 37. As a rule, "a general-welfare" clause of this kind cannot be construed as applicable to any subject that is elsewhere otherwise specially provided for. Dill. Mun. Corp. (3d Ed.) §§ 315, 316. Nor can the trade or occupation of washing clothes be considered "offensive," so as to bring it within the operation of the last clause of said subdivision 3. In the common ac-

·ceptation of the phrase, washing is a useful and inoffensive occupation, unless it is made offensive by the fact that the labor is here principally performed by the Chinese. But while this circumstance may ·excite race prejudice, it by no means makes the business "offensive" to the senses. It may be admitted that the immediate vicinity of a wash-house is not the most desirable location for a residence or some .kinds of business, and therefore those who can afford it will generally seek some more costly or secluded location. But if this makes .an occupation "offensive," within the meaning of the statute, a majority of the occupations, and a large portion of the residences of the city, are so. *The Laundry Ordinance Case*, 7 Sawy. 529; S. C. 13 FED. REP. 229. Besides this clause is another general one, leveled at "all offensive trades or occupations," while specifying none, and must, according to the rule, be construed as not applicable to any subject ·already specially provided for, as this is."

It only remains to consider whether the sum of $20 a year, payable quarterly, is a license fee or a tax; a reasonable sum imposed ·on the petitioner to meet the probable expenses of the regulation, or .an arbitrary one for the purpose of revenue. It is difficult to see how there can be any special or extraordinary expense dependent upon this regulation, except that for issuing and recording the license, and ·certainly the sum of one dollar is amply sufficient for that. If the license and fee therefor is merely required as a means of regulation, ·there is·no use of going to the trouble and expense of repeating the ·operation four times a year. An annual license is sufficient for all purposes of regulation, and nothing more is usually required for that purpose. But the' provision requiring the license to be taken out quarterly is strongly suggestive of revenue rather than regulation. There is nothing in the business or proposed regulations for. which the city is likely to incur any special expense. The provisions con-, cerning the register and drainage are simple matters, and do not re- ·quire any addition to its police force; while the provision requiring connection to be made with a sewer or cess-pool for the purpose of drainage is nóthing more than is or ought to be applicable to every house in the city.

In *Ash* v. *People*, 7 Cooley, 347, it was held that the council of Detroit, under the power to license and regulate the sale of meats, might ·charge a fee of $5 for such license for, as I infer, the period of one year. And the fee in this case should certainly be no more than in that. In *Duckwall* v. *New Albany*, 25 Ind. 283, it was held that the defendant, under the power "to regulate" ferries having a landing within its limits, could not charge a fee of $300 for a license therefor. Now, $300 per annum for a license to run a ferry on the Ohio river at New Albany, in 1865, was probably a smaller compensation relatively than $20 a year for keeping a wash-house in Portland. There are other cases, as, for instance, *Boston* v. *Schaffer*, 9 Pick. 419, and *Burlington* v. *Putnam Ins. Co.* 31 Iowa, 102, in which comparatively high fees

have been sustained; but there the power to license was backed by the further provision that the municipal council in question might impose such terms or charge such sum for such license as to it might seem just and reasonable, or expedient. And this is, in effect if not in form, a power to tax the licensed occupation. But here there is not even an express power to license, let alone tax. The power to license is only implied from the power to regulate, and can only be used for that purpose. All things considered, it is apparent that the sum required to be paid the city for this license is far beyond any special expense that it may incur on account of the regulation to which it pertains; and it is quite clear from this fact, as well as the time and manner of its payment, that this sum is, in effect, a tax, and was so intended. This being so, the ordinance is so far void, and the petitioner is restrained of his liberty without due process of law, contrary to the constitution of the United States.

No question was made on the argument as to the jurisdiction of the court. The grounds of it are briefly stated in a similar case, (*In re Lee Tong*, 18 FED. REP. 255,) in which it is said: "The power of this court to allow the writ and discharge the prisoner, in case he is in custody in violation of the constitution, or of a law or treaty of the United States, is given by sections 751–755 of the Revised Statutes. And if the prisoner is imprisoned without due process of law, he is deprived of his liberty in violation of the fourteenth amendment, which provides that no 'state shall deprive any person of life, liberty, or property without due process of law;'" citing *Parrott's Case*, 6 Sawy. 376; S. C. 1 FED. REP. 481; *In re Ah Lee*, 6 Sawy. 410; S. C. 5 FED. REP. 899. See, also, *The Laundry Ordinance Case*, 7 Sawy. 526; S. C. 13 FED. REP. 229; *In re Wong Yung Quy*, 6 Sawy. 237.

The *Case of Lee Tong* is referred to in the discussion of "*habeas corpus*," at the meeting of the American Bar Association for 1884, as a "flagrant" one—whatever that may mean. Report A. B. A. 29, 30. But beyond this ornate epithet, the criticism went no further than to complain of the act of 1867, by which the jurisdiction in question was conferred on "the lowest class of federal judges." But it is not denied that the jurisdiction is conferred, and, therefore, no "federal judge," however "low" he may be in the judicial hierarchy, can decline to examine it when a case is brought before him. But if the jurisdiction to discharge a person from imprisonment, who is deprived of his liberty, without due process of law, by a state, was not conferred upon the district and circuit judges, this provision of the fourteenth amendment, that was plainly intended as a bulwark against local oppression and tyranny, as well "up north" as "down south," would be a dead letter. The supreme court is too far away, and the way there is too expensive, to furnish relief in the great majority of cases, either upon a direct application or on an appeal from the state court. But the supreme court ought to have the power to review the

judgments of the district and circuit courts in these cases; and the state, the legality of whose act is involved in the proceeding, ought to have the right to be heard as a party thereto. And it might be well, where the petitioner is imprisoned on final process from a state court, that the writ might be allowed by either the district or circuit judge, returnable only into the circuit court, where the cause should not be heard until two of the judges of that court were present; and that in the mean time the prisoner might be admitted to bail.