Argued September 25; affirmed November 6, 1946

STATE EX REL. PETERSON *v.* WOODRUFF ET AL.

(173 P. (2d) 961)

DAVID R. VANDENBERG, Judge.

*Samuel B. Weinstein,* of Portland (George Neuner, Attorney General, of Salem, Samuel B. Weinstein, of Portland, on the brief), for appellant.

*William Ganong,* of Klamath Falls, for respondents.

Before BELT, Chief Justice, and ROSSMAN, KELLY, BAILEY, BRAND and HAY, Justices.

BRAND, J.

Action by the State of Oregon to recover from the defendants the amount of $820.94 alleged to be due and unpaid under the provisions of the Oregon Milk Control Act as balance of license fee on account of milk received and handled by the defendants as milk dealers and licensees under the act. From a judgment for defendants, the plaintiff appeals.

The plaintiff State of Oregon upon the relation of E. L. Peterson, Director of Agriculture, brings this suit against R. C. Woodruff and Ray C. Smith, co-partners, doing business as the Lost River Dairy. In addition to various recitals concerning the law, the complaint alleges that the defendants were duly licensed under the Milk Control Law as milk dealers authorized to receive, handle and sell fluid milk suitable for human consumption in the Klamath Falls production and sales area, that as such dealers and licensees they received and handled in the City of Klamath Falls, Oregon, a total of 357,962.59 pounds of butterfat suitable for sale as fluid milk and cream for human consumption and by reason thereof there became due and owing as license fee the sum of $1,789.81, and that the defendants have

paid the sum of $968.87, leaving a balance of $820.94, for which judgment is prayed.

In their answer the defendants admit that they were duly licensed milk dealers, that as such during the period in question they received and handled a total of 193,775.60 pounds of butterfat as fluid milk and cream for human consumption and no more, and that on account thereof there became due and owing as license fee the sum of $968.87 which the defendants have paid.

By stipulation the cause was tried by the court without a jury. The court made findings of fact and conclusions of law adverse to the contention of the plaintiff to which objections were filed and overruled. Proposed substitute findings as submitted by the plaintiff were rejected and judgment entered dismissing plaintiff's complaint.

The findings, which have the effect of a special verdict by a jury, after the recital of formal matters continue:

"IV. That defendants as such milk dealers and licensees between May, 1942, and November 30, 1944, inclusive, received and handled at Klamath Falls, Oregon, a total of 193,775.60 pounds of butterfat as fluid milk and cream for human consumption and no more, and by reason thereof there became due and owing as license fees the sum of $968.87, which fees defendants have paid to plaintiff and his predecessor, the Milk Control Board.

"V. (a) That during said period defendants purchased in California for sale in California, 164,186.99 pounds of butterfat bringing the same to its plant in Klamath Falls, Oregon, and there pasteurizing the same, and then pursuant to contracts entered into without the State of Oregon, sold and delivered the same in 10 gallon cans to War Relocation Authority at Tulelake, California; that payment for same was made to defendants in California.

"(b) That the contracts for the sale of the milk referred to in this paragraph V provided and specified that said milk should be 'Factory Milk' and that the bacterial count of the pasteurized milk should not exceed 50,000 and that the raw milk prior to pasteurization might be produced on farms acceptable to the Oregon State Department of Agriculture for factory milk in order to procure the quantity demanded, raw milk of higher quality being unavailable in the quantity demanded.

"(c) That the milk referred to in this paragraph V was processed separately and after the processing of the milk referred to in Par. IV hereof.

"(d) That the milk referred to in this paragraph V was 'Factory Milk.'

"(e) That the milk referred to in this paragraph V could not be sold in the State of Oregon for human consumption in fluid form.

"(f) That defendants were not licensed under the Milk Control Law to so sell any milk in the State of California and that the sales referred to in this paragraph V were not made by defendants as such licensees.

"VI. That plaintiff demanded payment from defendants of the sum of $820.94 as license fees for the butterfat described in paragraph V hereof and that defendants refused to pay the same or any part thereof."

The court concluded as a matter of law that defendants were not liable.

BRAND, J.

The undisputed evidence shows that during the period in issue the defendants have paid the license fee at the statutory rate upon 193,775.60 pounds of butterfat sold in the State of Oregon as fluid milk and cream and for human consumption. The amount for which suit is brought represents a poundage fee calculated at

the statutory rate upon the balance of 164,186.99 pounds of butterfat which the defendants received and handled in Oregon but sold in California. Both the contract to sell and the sales were made in California. The product was delivered by the defendants to the War Relocation Authority at Tule Lake, California, and payment was made in that state.

■■ The burden of proof is upon plaintiff to show the poundage of butterfat for which the fee became due. There is no evidence that the defendants received and handled within this state, for sale in this state, any milk as defined by statute in excess of the amount on which the fee has been paid. The plaintiff asserts that findings of fact (except No. 6) are not supported by substantial evidence. Some of the findings appear to be mixed statements of fact and law. But in view of the burden of proof and the condition of the evidence to which we have referred, we hold that there is support for the only findings which are essential to the decision. The court specifically found that the milk sold in California was processed separately after the processing of the milk sold in Oregon. While there was some conflict in the testimony on that issue, the finding of the trial judge is conclusive. The parties have expressly agreed upon an exact statement of the issue to be determined by this court. We quote:

"The essential issue involved in this appeal is whether or not the plaintiff, as Director of Agriculture of the State of Oregon, is entitled to poundage fees on 164,186.99 pounds of butterfat received and handled by the defendants at their milk plant in Klamath Falls, Oregon, and sold to the War Relocation Authority at Tule Lake, California, for human consumption in fluid form by the Japanese interned at Tule Lake. If the plaintiff is entitled to such poundage fees, then the judgment entered is

erroneous and requires reversal. On the other hand, if the plaintiff is not entitled to the poundage fees on that quantity of butterfat sold to California, then the judgment should be affirmed."

The defendants concede that they were milk dealers and licensees under the provisions of the Oregon Milk Control Law; but in substance they contend that under the statute they became liable only for poundage fees for milk sold by them *as such licensees and milk dealers* and that the milk received and handled by them at Klamath Falls but contracted, sold and delivered in California was not received or handled by them as licensees or milk dealers within the meaning of the statute.

In quoting from the statute we shall italicize for the purpose of emphasis. The statute provides in part:

"Definitions. * * * 'Milk dealer' means any person who purchases or handles milk *within the state* for sale *in this state,* or sells milk *within the state,* except when consumed on the premises where sold; * * *

"'Producer' means a person producing milk *within the state of Oregon;* * * *

"'Milk' means fluid milk and sweet cream sold for human consumption in fluid form; * * * ." O. C. L. A. § 34-1001.

In the section entitled "License Fees," the statute provides for a license fee for stores selling milk and continues as follows:

"(b) All other *milk dealers* shall pay a license fee of one dollar ($1) per year and in addition thereto one-half of one cent on each pound of butterfat contained in milk received and handled by the licensee, commencing with the effective date of this act. * * * " O. C. L. A. § 34-1007 (b).

There is no provision of the Milk Control Law which prohibits milk dealers from selling milk in California or which requires a license for such sale. The statute reads as follows:

"No milk dealer shall buy milk from producers or others *for sale within this state,* or sell or distribute milk *within the state,* unless such dealer is duly licensed so to do as provided in this act." O. C. L. A. § 34-1004.

There are other provisions in the statute imposing duties upon licensees, but the section last quoted is the only one which expressly defines the acts which cannot lawfully be performed without a license.

■ As said by Judge Deady in The Laundry License Case:

"A license is merely a permission to do what is unlawful at common law, or is made so by some statute or ordinance, including the one authorizing or requiring the license." *The Laundry License Case,* 22 F. 701, 703, (U. S. Dist. Ct., Dist. Ore.)

See also 33 Am. Jur., Licenses § 2, p. 325; 37 C. J., Licenses § 1, p. 166.

In its brief the plaintiff expressly states that it "does not contend" that a person located in Oregon and engaged exclusively in the sale of milk in California "would be required to become a milk dealer under the Oregon Milk Control Law and subject himself to the payment of poundage fees."

Based on these premises it is argued with much force that the defendants in selling milk in California were not acting as milk dealers or licensees under the statute because they were not doing anything which cannot be done lawfully without a license.

■ It is axiomatic that we should look to the entire statute in determining the expressed intent of the legislature. The preamble of the law recites that the production and distribution of milk is a paramount industry upon which the prosperity and health of the people *of the State* of Oregon depend. The emergency to which reference is made is an economic emergency in which the orderly production and marketing of milk have broken down with the result that the agricultural assets supporting the credit structure *of the state* have been impaired. It recites that unhealthful, unfair, injurious, destructive and demoralizing trade practices had grown up *in the state* "which impair the dairy industry *in the state* and the constant supply of * * * milk to the inhabitants thereof," and which constitute a menace to the health of the *inhabitants of the state.* Again we quote: "The production, transportation, manufacture, storage, distribution and sale of milk and cream *in the state* hereby is declared a business affecting the public health and interest * *. * ." Ore. Laws 2d Spec. Sess. 1933, Ch. 72.

O. C. L. A. § 34-1006 provides for the suspension or revocation of licenses "when it appears (a) that the milk dealer has failed to account and make payment, without reasonable cause, for milk purchased from a producer," etc. A producer is defined supra, § 34-1001, as a person producing milk within the State of Oregon. Thus the authority to revoke licenses under § 34-1006 (a) does not authorize the revocation of any license for failure "to account" for milk purchased outside the State of Oregon.

The Board, or its successor, the Department of Agriculture, is authorized to limit licensed dealers to a particular market or markets *within the state.* O. C.

L. A. § 34-1009. It is directed to ascertain what prices for milk in each market area *of the state* will best protect the milk industry, and it "shall take into consideration all conditions affecting the milk industry, including the price necessary to produce a reasonable return to the producer and to the milk dealer," and it shall fix minimum prices to be charged for milk and sold within the state for human consumption in fluid form. O. C. L. A. § 34-1012.

It must be remembered that the Milk Control Act was first passed in 1933, Second Special Session, and that the powers of regulation therein created were first vested in the Milk Control Board. The functions of the Board were then separate from the functions of the Department of Agriculture which had the administration of many sanitary and inspection laws and the collection of license fees to defray the expense of their administration. It was not until 1943 that the Milk Control Law was transferred to the State Department of Agriculture to be administered by the same authority which administered the inspection and license laws relative to the dairy industry.

If the purpose of the Milk Control Act were to provide sanitary regulations and inspections of the plants of milk dealers and if the cost of such inspections were to be paid for by fees based on the quantity of milk processed by the dealer, there might be reason to infer that the legislature intended that the fee should be calculated upon the amount of milk received and handled regardless of its source or its destination. The statutes of the state providing for sanitary regulations and inspections and imposing licenses applicable to milk dealers are too numerous for specific mention. In most of those statutes license fees are imposed and the

proceeds appropriated for the purpose of defraying the expenses of inspection under the respective acts. See, for example, O. C. L. A. §§ 29-127, 29-134 and amendment, Ore. Laws 1941, Ch. 423, § 1; O.C.L.A. §§ 34-205, 34-219, 34-312, 34-323, 36-103, 36-106, 99-2246, 99-2254; Ore. Laws 1941, Ch. 326, § 17.

As distinguished from the general inspection laws and sanitary laws, the Milk Control Law empowers the Department of Agriculture to supervise and regulate the industry *of the state* including production, transportation, manufacture, storage, distribution and sale. The provisions for inspection are limited to business records and accounts of any milk dealer. O.C.L.A. § 34-1003 (e). Production quotas, prices and market areas are regulated, and the expenses of the Board are to be paid from the receipts from license fees which are credited by the State Treasurer to the "Milk Control Account." Only such amount of money from said account as may be necessary is appropriated for the payment of the expenses of the Milk Control Board in administering and enforcing the Act. O. C. L. A. § 34-1015. It is of interest to note that the 1945 Legislature declared it to be the public policy of the state that sanitary legislation be enforced by the State Board of Health, O. C. L. A. § 99-2258 (b) (Ore. Laws 1945, Ch. 328, § 2), and that regulatory legislation be enforced by the Department of Agriculture, O. C. L. A. § 99-2258 (c) (Ore. Laws 1945, Ch. 328, § 3).

When the relevant statutes are examined, it becomes clear, as stated in *Savage v. Martin,* 161 Or. 660, 91 P. (2d) 273, that "the evils which the Oregon Milk Control Law are intended to correct are chiefly economic ones," and that its purposes are limited to the supervision and regulation of the milk industry within the state of

Oregon for the mutual benefit of the Oregon industry and the inhabitants of this state.

The functions of the Department of Agriculture in stabilizing and improving the economic situation of the industry and the expenses which it incurs are matters wholly unrelated to the receiving and handling of milk produced in California, processed in Oregon and sold in California. There is no reason to suppose that the Legislature intended to tax transactions which have no bearing upon the functions of the Milk Control Board in order to support its functions which are limited to the regulation of the industry in Oregon.

Serious inequalities would arise in the enforcement of the Act if the construction that is urged upon us by the plaintiff were adopted. As we have said, it is conceded that a plant which purchased its milk from California, processed it in Oregon and sold all of it in California, would not be subject to the Act. Under the construction urged upon us by the plaintiff, if a person owned and operated a milk plant in the City of Portland as a licensed milk dealer selling milk in the State of Oregon and if the same person owned and operated a plant in Klamath Falls which only processed milk for resale to California, such a person being a licensee and milk dealer would be required to pay the poundage fee on milk sold to California from the Klamath Falls plant although a separate plant operated by another person in the same area and selling milk only in California would be free from the license imposed.

We are relieved of the necessity of considering the constitutional questions which were involved and discussed in *Milk Control Board of Pennsylvania v. Eisenberg Farm Products,* 306 U. S. 346, 83 L. Ed. 752, 59 S. Ct. 528, for the defendants by implication concede the

authority of that case and expressly state that no constitutional question is involved. Their defense is based solely upon the matter of statutory construction. The defendants draw some support from the Eisenberg Farm case. The Pennsylvania statute involved in that case was enacted in 1935. The case was decided by the United States Supreme Court in 1939. The Oregon statute, passed in 1933, was amended in 1935, 1939 and 1943. Legislation affecting the milk industry was passed at every session of the Legislature from 1933 to 1945, inclusive. The wording of the Pennsylvania statute and its construction by the Supreme Court were no doubt familiar to all. That statute defined a milk dealer as any person ''who purchases or handles milk within the Commonwealth for sale, shipment, storage, processing or manufacture *within or without the Commonwealth.*'' If the Oregon Legislature had desired to impose a license fee upon milk processed in Oregon but sold without the state, it had before it judicially construed language which, if adopted, would have clearly accomplished the desired result. No such amendment was ever adopted.

■ In drawing the complaint the plaintiff seems to have recognized the principle that the act done by the defendants must have been as a milk dealer if the license is to be collected. The plaintiff alleges that the defendants as milk dealers and licensees received and handled 357,962.59 pounds of butterfat which quantity includes the milk sold in California, but at this point the specific allegations of the complaint depart from the statutory phraseology and in fact raise an immaterial issue. The product received by defendants is described as ''butterfat suitable for sale as fluid milk and cream for human consumption.'' The receipt or handling of butterfat suitable for such sale does not

bring one within the definition of a milk dealer, because suitability for sale is not the test by which we are to identify a milk dealer. If we combine the definition of "milk dealer" with that of "milk," it will appear that a milk dealer is one who purchases or handles fluid milk and sweet cream for human consumption in fluid form for sale in this state or who sells such milk within the state. Thus we see that the plaintiff seeks to recover by proving that the defendants received milk suitable for the defined purpose though it does not allege or prove that it was received or handled for sale in this state or sold within the state. Notwithstanding the general allegation that the acts were done as milk dealers, the plaintiff's case amounts only to this: That the defendants being milk dealers should be charged with license fees for transactions which were not carried on as such dealers.

■ We hold that the Oregon statute must be construed to apply only to milk which is received and handled by a milk dealer as such, i. e., as one "who purchases or handles milk within the state for sale in this state." O. C. L. A. § 34-1001, supra. The sales in California were not made as milk dealers or licensees because they could be lawfully made without violating any provision of the statute and without securing a license or qualifying as a milk dealer within the definition of the statute.

Our decision is limited to the facts in this case. A different question might be presented if the California milk were commingled with Oregon Milk and sold in Oregon. We find it unnecessary to discuss that question. The judgment of the Circuit Court is affirmed.