# Richmond

PET DAIRY PRODUCTS COMPANY v. STATE MILK COMMISSION.
SOUTHERN MAID, INCORPORATED v. STATE MILK COMMISSION.

November 30, 1953.

Record Nos. 4129, 4130.

Present, All the Justices.

The opinion states the case.

*Hunton, Williams, Anderson, Gay & Moore; Penn, Hunter, Smith & Davis; George D. Gibson, John W. Riely, S. J. Milligan* and *T. Justin Moore,* for appellant, Pet Dairy Products Company.

*J. Lindsay Almond, Jr., Attorney General; David J. Mays* and *Henry T. Wickham,* for appellee, State Milk Commission.

*Hunton, Williams, Anderson, Gay & Moore; Penn, Hunter, Smith & Davis; George D. Gibson, John W. Riely, S. J. Milligan* and *T. Justin Moore,* for appellant, Southern Maid, Incorporated.

*J. Lindsay Almond, Jr., Attorney General; David J. Mays* and *Henry T. Wickham,* for appellee, State Milk Commission.

WHITTLE, J., delivered the opinion of the court.

The question here presented is: Does the State Milk Commission have the power to fix the price paid to Virginia milk producers for milk sold and processed in Virginia for distribution outside the Commonwealth? The answer to this question involves construction of the Act creating the State Milk Commission, and interpretation of the price-fixing powers granted the Commission under the Act.

No issue is here made as to the power of the Commission to regulate the price paid for milk consumed in Virginia. It is admitted that the Act confers this power. Nor is the constitutionality of the Act here involved. We held it to be constitutional in *Reynolds* v. *Milk Commission,* 163 Va. 957, 179 S. E. 507. As heretofore stated, the sole question for our determination is whether the language of the Act confers upon the Milk Commission the right to regulate the

price paid for milk purchased and processed in Virginia for distribution outside the State. Appellants appealed to the Circuit Court of the City of Richmond from a ruling of the Commission asserting its power to regulate the price of such milk. The Commission's ruling was affirmed by the trial court in its decree of September 15, 1952, from which decree we granted this appeal.

Appellants are distributors of fluid milk in the Southwest Virginia milk market. They also operate in adjoining areas of Kentucky and Tennessee, where they resell to customers in those States fluid milk bought and processed in Virginia. Neither Kentucky nor Tennessee regulates the price of milk.

The Southwest Virginia milk market, as created by the Commission, includes the nine counties of Virginia's southwestern tip. The center of the area is near Tennessee, Kentucky and West Virginia, and its economy is necessarily integrated with that of these States.

The producers in this milk market deliver their milk to the plants or receiving stations of appellants. If the milk is delivered to the receiving station the distributors (appellants) take it from the station to their plants where it is processed and bottled for distribution and sale. These plants are located in Virginia.

The Commission has established general classifications of milk on the basis of its ultimate use. Class "I" is milk sold by the distributor as fluid milk, whether in bulk or in bottles. The price for Class "I" milk is established by the Commission. All other milk is placed in Class "II", and the price is wholly determined by competitive forces. The price paid to the producer by the distributor is not fixed when the milk is received; it is determined when the ultimate disposition of the milk is known. Under this plan, milk delivered during one month is paid for the following month.

Producers of milk (the dairymen) are assigned to named distributors and are given normal production quotas or "base allotments". When a distributor's sale of Class "I"

(fluid) milk equals the total of the base allotments of his producers, each producer is paid the whole of his base allotment multiplied by the Commission-established price, provided his quota is filled. He is also paid the unregulated price for the excess, if any, beyond his base allotment.

If the sales of Class "I" milk are greater or less than the total of base allotments, payment of the established price is made in proportion to such allotments. Thus all milk is put in a pool and its price is determined by the average of all producers. The ultimate disposition of the milk is known before payment is computed.

Southern Maid purchases approximately one-third of the total milk in this market. One-third of this amount is resold for consumption in Virginia, the remainder going to Kentucky or Tennessee. Southern Maid's plant is located at Bristol, Virginia. The milk is received at the plant and is there processed for the Virginia, Kentucky and Tennessee markets.

The principal Virginia plant of the Pet Dairy Products Company in this market is at Big Stone Gap. This plant maintains receiving stations at Rural Retreat and Abingdon, Virginia. As in the case of Southern Maid, Pet's processed milk is distributed not only within Virginia but also in Kentucky.

The Act of the General Assembly here under consideration, Chapter 357, Acts of 1934, together with amendments thereto, has been codified as Title 3, Chapter 17, Code of Virginia, 1950. As codified, this chapter does not recite the considerations which impelled the General Assembly to adopt the Act. These are, however, found in the Acts of 1934, at pages 558 and 559. There it is made plain that the legislature was concerned with "the prosperity and health of the people of the Commonwealth of Virginia". Clearly, this preamble, as well as the Act itself, has economic implications, i.e., the stabilization of the milk industry so as to enable the producers (dairymen) to secure a fair price for their milk. But the passage of the Act was also prompted

by a desire to provide a "constant supply of pure, whole-some milk to the inhabitants" of Virginia. Thus the dairy business was "declared a business affecting the public peace, health and welfare", to be regulated as provided in the Act. These recitals set the framework for the legislation.

We have held, "There is no inherent power in the Milk Commission to fix the price of milk. Whatever price-making power it has must be found in the statute." *Lucerne Cream and Butter Co.* v. *Milk Commission*, 182 Va. 490, 494, 29 S. E. (2d) 397, 398.

Section 3-352 of the Code enumerates the powers vested in the Commission, and states: "The Commission is declared to be an instrumentality of the Commonwealth, vested with the power:

＊ ＊ ＊ ＊ ＊ ＊ ＊

"(c) *Supervision and control.*—To supervise, regulate, and control the production, transportation, processing, stor-age, distribution, delivery and sale of milk for consumption within the State."

The Commission's power is thus confined to the Com-monwealth of Virginia and is limited by these words grant-ing it authority to regulate the "sale of milk for consump-tion within the State". When the grant of regulatory power was thus restricted to milk "for consumption within the State", necessarily milk for consumption outside the State was excluded. This limitation in the power-granting section (3-352) qualifies all other provisions of the Act.

It is argued, however, that the price-fixing section (3-359) does not repeat this limitation, and that accordingly the lim-itation is inapplicable to it; in other words, that the Act can be considered piecemeal and its grant of price-fixing powers read as unlimited.

The Commission argues that the General Assembly has gone as far as it could in price regulation within the limita-tions of the Federal Constitution. Appellants make no con-tention as to Federal rights. They say, "It may well be that Virginia has the constitutional authority to regulate the price

paid for export milk. But the General Assembly has not gone so far and the Commission is not entitled to pick the Act apart to reach the result it desires."

We cannot accept the argument of the Commission. We held in the *Lucerne* case that the Act "must be viewed and considered in its entirety". (182 Va., at p. 498) When it is so considered it is evident that the General Assembly did not intend to regulate the price for export milk.

▉ Upon examining § 3-346, defining words used in the Act, we find that "market" is defined as "any city, town or village of the State * * * and surrounding territory designated by the Commission * * * ." It is clear that the word "market" as thus used designates a territory with its boundary limited to the confines of Virginia, such as the Commission-established Southwest Virginia milk market here involved.

The word "distributor", used in section 3-346, is defined to include, " * * * any of the following persons engaged in the business of distributing, marketing, or in any manner handling fluid milk, in whole or in part, in fluid form for consumption in this State." It is only as to that part of a person's activities that he becomes a distributor. Under this section a distributor includes persons "wherever located", but only if they handle milk for resale as fluid milk in Virginia.

The price-fixing section of the Act (§ 3-359) authorizes the Commission to "fix the prices to be paid producers * * * by distributors in any market". According to the Commission's argument its authority to " * * * fix the price to be paid producers * * * by distributors *in any market * * * "* (italics supplied), means any market within or without the State of Virginia. We cannot so construe the section. The legislature having plainly said in § 3-352(c) that the Commission's control is limited to the "sale of milk for consumption within the State", and thus once having plainly limited the jurisdiction of the Commission in words which are susceptible of only one construction, it is not necessary

to repeat this restrictive provision in every section of the chapter. The words quoted from § 3-359, "by distributors in any market", clearly contemplate a market created by the Commission within the borders of this State. It cannot be contended that the Commission has a right under the Act to create a market outside the confines of Virginia.

Our construction of the Act is further confirmed by the provisions of its licensing and penal sections. The licensing power of the Commission is limited to the granting of licenses to "distributors". Here again the local nature of the Commission's regulatory power is restated in § 3-360: "The Commission may require all distributors in any market designated by the Commission to be licensed. * * * The Commission * * * may issue licenses to distributors to process or store or sell milk to a particular city or village or to a particular market or markets *within the State.*" (Italics supplied) Under this section, if the distributor does not obtain a license, the Act provides a sanction. But the prohibition does not extend beyond the limits of the licensing power.

Section 3-365 provides: "No distributor in a market in which the provisions of this article are in effect shall buy milk from producers, or others, for sale *within the State,* or sell or distribute milk *within the State,* unless such distributor is duly licensed under the provisions of this article." (Italics supplied)

Thus, if the distributor does not buy milk "for sale within the State", no license is required. The license is required only when the distributor purchases milk for consumption "within the State". Then, and only then, does he become subject to Commission regulation. If the distributor buys for export only he needs no license.

The wording of the Virginia statute is not unique. Other States, including the State of Oregon, have statutes similar to ours. In the case of *State* v. *Woodruff,* 179 Ore. 640, 173 P. (2d) 961, a question similar to the one here under consideration was presented. The case involved unpaid license

fees assessed against the dealer (distributor) by the Oregon Milk Control Board. The dealer (distributor) contended that he had paid all fees required in respect to milk sold by him for consumption within the State, and that he was not required under the statute to pay fees on milk sold for consumption outside the State. The position of the dealer was sustained on the ground of statutory interpretation by both the trial court and the Supreme Court of Oregon. The Oregon Act is similar to the Virginia Act (§ 3-346) and defines a milk dealer (called distributor in Virginia) as one who "purchases or handles milk *within the State* for sale *in this State*." (179 Ore., at p. 645)

The Board's argument in the *Woodruff* case was that the defendant (dealer or distributor) was admittedly a dealer as to milk handled for sale in Oregon and therefore should be taxed on all milk wherever sold. The court held this interpretation to be in conflict with the legislative purpose. To ascertain the purpose the court said: "It is axiomatic that we should look to the entire statute in determining the expressed intent of the legislature." (179 Ore., at p. 647)

After referring to the preamble of the Act which disclosed concern as to the "health of the people of the State of Oregon", the court limited the Commission to the licensing of dealers for particular markets "within the State". The Oregon Act's only prohibition against operations by unlicensed dealers was in the same words as those employed in the Virginia Act: "No milk dealer shall buy milk from producers or others *for sale within this State*, or sell or distribute milk *within the State*, unless such dealer is duly licensed so to do as provided in this Act." (179 Ore., at p. 646)

The Supreme Court of Oregon pointed out the difference between the Oregon statute and the Pennsylvania statute which defines a milk dealer (distributor) as one "who purchases or handles milk within the Commonwealth for sale, shipment, storage, processing or manufacture *within or*

*without the Commonwealth* (Pennsylvania)." (179 Ore., at p. 651)

With the Pennsylvania statute in mind, the Oregon court referred to the case of *Milk Control Board of Pennsylvania* v. *Eisenberg Farm Products*, 306 U. S. 346, 83 L. ed. 752, 59 S. Ct. 528, saying: "The case was decided by the United States Supreme Court in 1939. The Oregon statute, passed in 1933, was amended in 1935, 1939 and 1943. Legislation affecting the milk industry was passed at every session of the Legislature from 1933 to 1945, inclusive. The wording of the Pennsylvania statute and its construction by the Supreme Court were no doubt familiar to all. That statute (Pennsylvania) defined a milk dealer as any person 'who purchases or handles milk within the Commonwealth for sale, shipment, storage, processing or manufacture *within or without the Commonwealth.*' If the Oregon Legislature had desired to impose a license fee upon milk processed in Oregon but sold without the State, it had before it judicially construed language which, if adopted, would have clearly accomplished the desired result. No such amendment was ever adopted." (179 Ore., at p. 651) The same reasoning here expressed applies to the Virginia Act.

The Oregon court concluded: "We hold that the Oregon statute must be construed to apply only to milk which is received and handled by a milk dealer (distributor) as such, i.e., as one 'who purchases or handles milk within the State for sale in this State.'" (179 Ore., at p. 652)

While the *Woodruff* case dealt with a license tax, the issue there involved is in point with that in the case at bar.

The provision in the Pennsylvania statute, "or without the Commonwealth", is lacking in both the Oregon statute and the Virginia statute. We have no authority to write this provision into the Act. It is not our province to legislate. Our duty is limited to interpreting the Act as written. The legislature alone has the power to amend it.

We are of the opinion that the Act does not confer upon the State Milk Commission the power to fix the price paid

to Virginia milk producers for milk sold and processed in Virginia for distribution outside the Commonwealth.

Accordingly, the decree of the Circuit Court of the City of Richmond holding to the contrary is reversed and we here enter a decree in conformity with the views here expressed.

*Reversed and final decree.*