BORDEN'S FARM PRODUCTS CO., INC. *v.* TEN EYCK, COMMISSIONER OF AGRICULTURE & MARKETS OF NEW YORK, ET AL.

No. 597. Argued January 6, 1936.—Decided February 10, 1936.

*Mr. Walter E. Hope,* with whom *Mr. Timothy N. Pfeiffer* was on the brief, for appellant.

*Messrs. Samuel Kramer* and *Henry S. Manley,* with whom *Mr. John J. Bennett, Jr.,* Attorney General of New York, and *Mr. David L. Weissman* were on the brief, for appellees.

256

MR. JUSTICE ROBERTS delivered the opinion of the Court.

This cause is here a second time. The prior appeal was from a decree denying a preliminary injunction and dismissing the bill.[1] We reversed, holding that evidence should be taken, findings and conclusions made, and a decree thereupon entered. After remand the appellant amended its bill, the court sent the case to a master who made findings of fact, stated his conclusions of law, and

---

[1] 293 U. S. 194; 7 F. Supp. 352.

recommended that an injunction be entered. The District Court accepted the master's findings, and found certain additional facts, but dismissed the bill upon the merits.[2] From this judgment the present appeal was taken.

As will appear by reference to our former opinion the appellant's complaint is that the fixing of a differential of not to exceed one cent per quart on sales to stores, in favor of milk dealers not having a "well advertised trade name," by the Milk Control Law of April 10, 1933 (reënacted by the laws of 1934, chapter 126), was an invasion of rights guaranteed by the Fourteenth Amendment. The bill, as framed when the case was here before, recited that the administrative authority which fixed the minimum price on sales to stores found the appellant and three other milk dealers in the metropolitan market had well advertised trade names and the statute permitted dealers not having such trade names to sell bottled milk to stores at one cent per quart less than the minimum which dealers with well advertised trade names were required to charge, and also permitted stores to resell to their customers the unadvertised brands of milk at a price one cent per quart less than that at which the appellant's milk could be sold under the minimum fixed by the order. Resulting loss of business and irreparable damage were alleged.

In this court the appellees sought to justify the differential by the assertion that the statute was temporary in character, intended to relieve a temporary economic situation, and meanwhile to prevent monopoly of the business by dealers having well advertised names. In support of this position it was said that prior to the adoption of the Milk Control Act of 1933 independent dealers, so-called, had purchased from producers at prices lower than

[2] 11 F. Supp. 599.

those paid by appellant and other purveyors of well advertised brands, and in turn charged less to stores than the appellant and others in its class. By the Milk Control Act the independent dealers were compelled to purchase from the farmers on the same basis as the well known dealers; and to deprive them of this advantage and in turn to compel them to charge the same price for their milk as the well advertised brands commanded would be to transfer all their customers to the owners of well known brands, and put them out of business. The appellant replied that, prior to the adoption of the Milk Control Law, there had been a threat to forbid the sale of milk in bulk to stores; this compelled the independents who had formerly sold mostly bulk milk to change to the bottled trade, and keen competition ensued between them and the owners of well advertised brands with destructive price cutting throughout the greater part of New York City, so that there was no fixed price for bottled milk sold to stores either by the independents or the well advertised dealers. In support of these contentions we were referred to statements found in the legislative report leading to the adoption of the Milk Control Law, and the injunction affidavits.

We held we could not take judicial notice of local trade conditions prevailing in the City of New York; as the case had been disposed of below on the allegations of the bill, we were not called upon to examine the affidavits submitted in support of the motion for injunction and to find the facts; and the constitutionality of the challenged provision should be determined in the light of evidence upon the matters as to which the parties were in disagreement.

By amendment the appellant added to its bill paragraphs to the following effect: Prior to 1932, less than one-third of the fluid milk sold in New York was bottled, the balance being sold in bulk and under no trade name.

Toward the end of 1931 a commission recommended that the sale of loose milk to stores be prohibited. The Board of Health made an order, effective January 1, 1933, the effective date of which was subsequently postponed to June 1, 1933, prohibiting the practice. By reason of the impending ban upon the sale of loose milk, dealers engaged in the sale of that commodity were forced to make a drastic change in their methods. The transition from the sale of loose milk to bottled, which began about April 1, 1933, and continued until June 1, 1933, engendered widespread price cutting and a steadily declining price level, and brought about unsettled market conditions and great variations in price. At no time prior to the effective date of the Milk Control Act was there any trade custom, practice, or usage whereby the bottled milk of dealers thereafter classified as not having well advertised trade names was sold to stores at a price different from that of the bottled milk of the appellant and others classified as having well advertised trade names. Before April 10, 1933, and thereafter, the appellant was in active competition with more than one hundred and fifty dealers in the sale of bottled milk to stores in the city. The appellant and others classified as having well advertised trade names sell approximately twenty-one per cent of the bottled milk sold to stores. The prices paid by dealers to producers under the Milk Control Law have been the same for all dealers no matter how classified. All bottled milk must have printed on the cap the name of the dealer distributing it. The services rendered by the appellant and by so-called independent dealers differ in no respect.

The assertions of shrinkage of appellant's sales to stores consequent upon the establishment of the differential were repeated and amplified in the amended bill. An answer was filed denying the allegations of the bill. Much evidence was received.

The findings of the master establish that the dealers having a well advertised trade name, of which appellant is one, are in keen competition with each other and with the independent dealers, and have no monopoly, nor anything approaching a monopoly, of the sale of bottled milk to stores. The findings further demonstrate that the good will incident to appellant's well known trade-name "Borden's" has been built up largely by advertising, and there is no finding that the appellant's methods in that respect, or its trade practices, have been illegal. Grade B milk, with which we are alone concerned, must conform to standards of quality, purity and cleanliness prescribed by law, whether sold by appellant or by an independent dealer. The service rendered and the conditions of sale are the same for both. It is plain from these facts that the allowance of the differential cannot be justified as a preventive of monopoly or as a deterrent of illegal combination or illegal trade practices, or as a recognition of differences in the service rendered.

We are brought to the remaining issue of fact to resolve which the case was remanded. Was there a differential during a substantial period prior to adoption of the act between the price charged to stores by dealers having well-advertised trade names and that charged by those lacking this advantage?

The master's findings upon the point, though the appellant excepted to them, were adopted by the court below. They are to the effect that from November, 1931, to April, 1933, and for several years prior thereto, the independent dealers sold their bottled milk to stores in New York City for resale to consumers at one or more cents per quart below the price at which the advertised dealers were selling their bottled milk to stores in that city; and during the same years the stores were selling the independents' bottled milk to consumers from one cent to two cents per quart below the price at which they were

vending the bottled milk of the advertised dealers. The District Court made additional findings, supplementing those of the master, that independent dealers on occasions before November 1, 1931, and until April 1, 1933, tried to sell bottled milk to stores at the same price as that charged by the appellant and another advertised dealer, and in each case were compelled by loss of business to resume their earlier and lower price; and during the same period customers when offered the several brands at the same price would usually take a bottle of the well-advertised dealer's milk in preference to that of an independent dealer. These findings of the master and the court disclose the circumstances in the light of which the appellant's claim that it was denied the equal protection of the laws must be considered. The appellant assigns them as error; but they are supported by substantial evidence and we will not disturb them.

We hold that the fixing of the differential in favor of the sellers of milk not having a well-advertised trade name, in the situation exhibited by the findings, does not deny the appellant equal protection.

The argument is that the classification is arbitrary since the statute puts the appellant and other dealers who have well advertised trade names in a single class solely by reason of the fact that their legitimate advertising has brought them good will. So, it is said, they are penalized for their business skill and acumen. The answer seems sufficiently obvious. In enforcing its policy of price fixing,—a temporary expedient to redress an injurious economic condition,—the legislature believed that a fixed minimum price by dealers to stores would not preserve the existing economic method of attaining equality of opportunity. That method was for the well-advertised dealers to rely on their advertising to obtain a given price, and for the independents to retain their share of the market, not by counter-advertising but by a slight

reduction of price. The one expedient the law did not purport to touch; the other by fixing the same minimum for all dealers it would effectually destroy. In these circumstances, it was competent to the law makers to attempt, during the limited term of the legislative experiment, to preserve the existing relationship of advantage established by the past trade practices of the two groups. So to do, we must assume, was within the legislative power under the state constitution. No prohibition of the expedient is found in the Federal Constitution, unless in the Fourteenth Amendment. We have held that article does not prevent the fixing of maximum and minimum prices for milk, in the circumstances existing in the State of New York in 1933.[3] We now hold that to provide that a differential of one cent maintained by the independent dealers shall continue does not deny their advertised competitors equal protection. There was a plain reason for the classification. It was not merely that appellant had established a good will; it was that there had resulted a balance between that advantage and the resulting disadvantage to the unadvertised dealer,— a balance maintained by a price differential. To attempt the maintenance of that balance was to strive for equality of treatment, equality of burden, not to create inequality. To adapt the law to the existing trade practice was neither unreasonable nor arbitrary. The present case affords an excellent example of the difficulties and complexities which confront the legislator who essays to interfere in sweeping terms with the natural laws of trade or industry. The danger in such efforts always is that unintended dislocations will bring hardship to groups whose situation the broad rules fail to fit. Where, as here, there is recognition of an existing status and an attempt to equate the incidence of the statute in accordance with it, we find a

---

[3] *Nebbia* v. *New York*, 291 U. S. 502.

compliance with, rather than a disregard of the constitutional guarantee of equal protection. The appellant cannot complain if, in fact, the discrimination embodied in the law is but a perpetuation of a classification created and existing by the action of the dealers. In the light of the facts found the legislature might reasonably have thought trade conditions existed justifying the fixing of a differential. Judicial inquiry does not concern itself with the accuracy of the legislative finding, but only with the question whether it so lacks any reasonable basis as to be arbitrary. *Standard Oil Co.* v. *Marysville*, 279 U. S. 582, 586–587.

A second argument is that, instead of maintaining equality between the two groups, the act has destroyed it by unduly favoring the independents. The differential is said to inflict grievous injury and irreparable and continuing damage upon the appellant. We must look to the record to determine whether it supports the appellant's claim. The master made numerous findings touching the relative sales of bulk and bottled milk to stores by the two groups of dealers at various times before and after the adoption of the act, and in respect of appellant's share of that trade in comparison with total sales and those of its independent competitors. He also found: "Since the enactment of the 1933 Law, the advertised dealers have had a smaller proportion relative to the independent dealers of the total sales of bottled milk to stores in New York City than before the enactment of the law." But neither in his findings nor in his general discussion does he say that the smaller volume of appellant is due to the differential provision. He does state: "the voluminous proofs fail to furnish facts on which to base a finding as to the effect of minimum prices without a differential." There is no fact finding of loss and damage to plaintiff from the differential. A conclusion of law is: "By reason of the differential provision, the

plaintiff is now suffering, and will continue to suffer irreparable damage." After a full discussion of the master's findings the District Court said: "From all this it seems to us very doubtful whether the differential has really damaged the plaintiff at all." We have examined the findings and the evidence, and concur in the conclusion. Though appellant, at the time of the trial, had acquired a large experience of the operation of the differential, its proofs and the findings based upon them, leave serious doubt as to the effect on the appellant's store trade of other factors, such as seasonal variation, the decrease in the consumption of milk in 1934, the change from loose to bottled milk in store distribution, and the sale of great quantities of so-called relief milk under arrangement with the public authorities. It has failed to show that as a result of the statute the independent dealers have gained trade at its expense, or that it has suffered substantial loss.

We have no occasion to determine whether the differential would become unlawful, and the appellant would be entitled to relief, if there were proof that in practice it produces such gross inequality, and so unnecessarily damages the appellant, as to shock the conscience.

*Decree affirmed.*

MR. JUSTICE McREYNOLDS, dissenting.

MR. JUSTICE VAN DEVANTER, MR. JUSTICE SUTHERLAND, MR. JUSTICE BUTLER and I think the challenged judgment should be reversed.

In *Nebbia* v. *New York*, 291 U. S. 502, 539, we stated reasons in support of the conclusion that the New York Milk Control Act of 1933 infringed the due process clause. We adhere to what we there said.

The present cause raises a distinct, although subordinate, question. Assuming that the general price fixing provisions of the Control Act are valid, do the provisions

which permit other dealers to sell below the minimum price prescribed for appellant deprive it of the equal protection of the laws? The answer should be in the affirmative.

Rational classification, based on substantial differences, is within legislative power. An act which permits dealer A to sell at less than the price fixed for dealer B obviously denies equality; and in the absence of some adequate reason for different treatment, the enactment is invalid.

Here appellant differs from favored dealers only in that it possesses a well advertised brand, while they do not. And solely because of that fact, the Legislature undertook to handicap it and thus enable others profitably to share the trade. There is no question of unfair trade practices or monopoly.

By fair advertisement and commendable service, appellant acquired the public's good will. The purpose is to deprive it of the right to benefit by this and thereby aid competitors to secure the business. This is grossly arbitrary and oppressive.

To support the legislation, it is said the Legislature believed that a fixed minimum price to stores would not preserve the existing economic method of attaining equality of opportunity. Apparently, this means that a dealer, who through merit has acquired a good reputation, can be deprived of the consequent benefit in order that another may trade successfully. Thus the statute destroys equality of opportunity—puts appellant at a disadvantage because of merit.

Merely because on a given date there were differences in prices under open competition, offers no rational reason for legislation abolishing competition and perpetuating such differences. The status existing under competitive conditions certainly is not preserved by destroying competition. Formerly, appellant had the right to adjust prices to meet trade exigencies and thus protect itself

from loss of business. Now it must stand helpless while adversaries take possession of the field. It may suffer utter ruin solely because of good reputation, honestly acquired.