89 So.2d 318 (1956)
Otis W. SHIVER, trading and doing business as Shiver's Super Store, 4735 W. Flagier Street, Miami, Florida, and Shiver's, 2001 S.W. 67TH Avenue, West Miami, Florida, Appellant,
v.
C. Raymond LEE, Henry J.J. Schneider, John M. Scott, Fred B. Ragland, Bertha M. Elliot, William Imand, and Ben S. Waring, members of and as constituting the Florida Milk Commission, Appellees.
Supreme Court of Florida. En Banc.
July 6, 1956.
Rehearing Denied September 13, 1956.
*319 Holladay & Swann, Miami, for appellant.
James Knight, and Walton, Lantaff, Schroeder, Atkins, Carson & Wahl, Miami, for appellee.
Chester Bedell, Jacksonville, amicus curiae.
TERRELL, Justice.
In March, 1955, the Florida Milk Commission, hereinafter referred to as the "Commission," filed complaint in the appropriate forum praying that Otis W. Shiver be restrained from retailing milk at a price below that set by the Commission. A temporary restraining order was granted without notice and defendant proffered his answer in which he incorporated a motion to dismiss challenging the constitutional validity of those provisions of Chapter 501, Florida Statutes 1953, F.S.A., relating to the power of the Commission to fix prices of milk to be sold at wholesale or retail. Depositions were filed by defendant and the Commission moved for final decree on the pleadings or in the alternative for summary final decree. Defendant also moved for summary final decree. The Circuit Court entered final decree for the Commission and decreed the temporary restraining order to be permanent, the effect of which was to uphold the validity of the challenged act. This appeal is from that decree.
The sole question for determination is whether or not sections 501.04, 501.13 and other provisions of Chapter 501, Florida Statutes, 1953, F.S.A., relating to the power of the Commission to fix maximum and minimum prices of milk to be sold at wholesale and retail are constitutional.
Appellant contends that this question should have been answered in the negative because (1) so far as Chapter 501, Florida Statutes, 1953, F.S.A., authorizes the Commission to fix milk prices, it is in violation of the due process clause of the State and Federal Constitutions; (2) the milk industry is not a business "affected with a public interest," that warrants price fixing by the legislature; (3) any temporary emergency requiring such an act has long since passed, and (4) the police power of *320 the state depriving one of freedom of contract during an emergency can not be continued or made permanent under the guise of a continuing emergency.
Appellant admits the force of Miami Home Milk Producers' Ass'n v. Milk Control Board, 124 Fla. 797, 169 So. 541, dealing with the constitutional validity of Chapter 17103, Acts of 1935, and Nebbia v. People of State of New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, treating a New York act of like import, but he says these cases were concerned with acts prompted by an economic emergency and have no influence on the question presented here wherein the act assaulted has to do with a "continuing emergency." He derives much comfort from Sullivan v. DeCerb, 156 Fla. 496, 23 So.2d 571; Liquor Store, Inc., v. Continental Distilling Corporation, Fla. 1948, 40 So.2d 371; McRae v. Robbins, 1942, 151 Fla. 109, 9 So.2d 284; Robbins v. Webb's Cut Rate Drug Co., 153 Fla. 822, 16 So.2d 121; Miles Laboratories v. Eckerd, Fla. 1954, 73 So.2d 680; State ex rel. Fulton v. Ives, 123 Fla. 401, 167 So. 394; Seagram-Distillers Corp. v. Ben Greene, Inc., Fla. 1951, 54 So.2d 235, and others not necessary to cite.
There is no doubt that Chapter 501, Florida Statutes, 1953, F.S.A., has to do with a "continuing emergency." The parties hereto admit this. One can not read the title and legislative findings which actuated the passage of said act without reaching this conclusion. In some of the cases cited in the preceding paragraph, this court approved the doctrine that except in times of economic emergency, inflexible price fixing is contrary to our traditional concept of free competition, the traditional "yardstick" for protection of the consuming public. In some of these cases, we also held that legislation of the type under consideration was constitutional, but would be held so only in extreme circumstances wherein our economic structure is seriously endangered. In other cases the act was stricken down because the emergency pointed out was not real but fanciful, no real public necessity was shown and the police power was invoked for nothing short of a private purpose.
The act under assault was first passed in 1933, Chapter 16078. It was an emergency act of limited duration. It was amended by Chapter 17103, Acts of 1935, and Chapter 18022, Acts of 1937. It was again amended by Chapter 19231, Acts of 1939, the latter act not being of limited duration. One can not read its title and the legislative findings, stated in section 1, now section 501.01, Florida Statutes, F.S.A., without being convinced that the legislature recognized an economic emergency to exist in the "production and distribution of * * * milk products in the State of Florida * * * that the present economic emergency is in part a result of the disparity between the prices of milk, cream and milk products and other commodities, which disparity has diminished the power of milk producers to purchase industrial products, and has broken down the orderly production and marketing of milk, cream and other milk products, and has seriously impaired the agricultural assets supporting the credit structure of the State of Florida and political subdivisions thereof; that unhealthful, unfair, unjust, destructive, demoralizing and uneconomic trade practices have grown up and have been carried on in the production, sale and distribution of milk, cream and milk products in this state which impair dairy industry of the state and imperil the constant supply of pure and wholesome milk to the inhabitants thereof, and constitute a menace to the welfare of the inhabitants of this state; that such conditions existed at the time of the creation of the milk control board and constituted a menace to the health welfare and reasonable comfort of the inhabitants of this state, and will again constitute such menace should all regulations as set forth in said law creating said board go out of existence."
*321 Section 501.01 then finds that in order to protect the well-being of our citizens, and to promote the public welfare and preserve the strength and vigor of the race, the production, transportation, manufacture, storage, distribution and sale of milk, cream and milk products is declared to be a business affecting the public health and interest of the citizen and that the production, transportation, manufacture, storage, distribution and sale of milk, cream and milk products to be a paramount industry upon which the prosperity of the State and the welfare of its citizens depend. In order to correct abuses arising from the destructive and unfair manipulation of prices which are found to spring from a selfish disregard of the public interest in the manner of conducting the dairy business, it is necessary to resort to the legislative remedy of regulating prices to save both producers and consumers from such manipulation of prices because such practices amount to evils which menace the health, safety and welfare of the people. The act further found that the acute economic emergency existing at the time of the creation of the Milk Control Board was partly the consequence of a severe and increasing disparity between the prices of milk and other commodities; that such practices are curtailed by the existence of said board but will immediately recur should said board pass out of existence; that the purchasing power of milk producers is in imminent danger of again being broken down; that the danger to the public health is immediate, the necessity urgent and such as will not admit of interruption in public supervision and control with proper standards of production, sanitation and marketing; that it is therefore necessary that said business be supervised and regulated.
We have never found a stronger finding of fact and statement of policy as the basis for regulating and administering a great industry than that embodied in the two paragraphs preceding this for control of the milk industry. Chapter 19231, Acts of 1939, from which Chapter 501, Acts of 1953, was in the main drawn, was a complete departure from the previous milk control acts, in that it recognized the necessity for continuous control and supervision of the milk industry. One can not read the findings of fact and statement of policy without being convinced that the paramount purpose of the legislature was to invoke the police power for protection of the public health, safety and welfare as well as the welfare of those engaged in the milk industry. Every legislature since said act was passed has amended and strengthened it and the 1955 legislature refused to repeal or modify it.
In People v. Nebbia, 262 N.Y. 259, 186 N.E. 694, affirmed in 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, supra, the court held that the Legislature had power when conditions require to regulate the prices of milk so that a fair return to the producer may be secured and the public welfare protected. Many jurisdictions have approved this holding. Miami Home Milk Producers' Ass'n v. Milk Control Board, supra; Franklin v. State ex rel. Alabama State Milk Control Board, 1936, 232 Ala. 637, 169 So. 295; Jersey Maid Milk Products Co. v. Brock, 1939, 13 Cal.2d 620, 91 P.2d 577; State v. Stoddard, 1940, 126 Conn. 623, 13 A.2d 586; Albert v. Milk Control Board, 1936, 210 Ind. 283, 200 N.E. 688; Johnson v. Michigan Milk Marketing Board, 1940, 295 Mich. 644, 295 N.W. 346; In re Opinion of Justices, 1937, 88 N.H. 497, 190 A. 713; State ex rel. State Board of Milk Control v. Newark Milk Co., 1935, 118 N.J. Eq. 504, 179 A. 116, cited in Abbotts Dairies, Inc., v. Armstrong, 1954, 14 N.J. 319, 102 A.2d 372, and in Garden State Farms v. Armstrong, 1954, 31 N.J. Super. 61, 105 A.2d 884; Savage v. Martin, 1939, 161 Or. 660, 91 P.2d 273; Rohrer v. Milk Control Board, 1936, 322 Pa. 257, 186 A. 336; State v. Auclair, 1939, 110 Vt. 147, 4 A.2d 107; Reynolds v. Milk Commission of Virginia, *322 1935, 163 Va. 957, 179 S.E. 507, followed in Pet Dairy Products Co. v. State Milk Commission, 1953, 195 Va. 396, 78 S.E.2d 645; State ex rel. Finnegan v. Lincoln Dairy Co., 1936, 221 Wis. 1, 265 N.W. 197, 851.
The general theory on which these cases proceed (most of which are milk cases) is that the milk industry is affected by elements of instability peculiar to the business that call for special control; it is one of the paramount businesses of the country and is geared to the health and welfare of the people, as well as the producer. Milk is perishable and can not long be stored; it is an excellent host for bacteria; it is essential to a balanced diet; babies could not subsist without it, in fact it is their primary medium of diet for the first year and it is settled that it is essential to the health of adults. If babies could vote as strong as cotton, beef, pork, corn, wheat, potatoes, peanuts and other commodities, the price of which is "pegged," at "parity," or close to it, the question raised here would have long been settled. These and other factors require safeguards to milk production and distribution that add materially to its cost. Safeguarding its purity and wholesomeness requires a vigilance greater than is required to preserve the purity of any other food product.
It is quite true that we have no case in Florida directly in point with the case at bar, but as revealed from the cases above cited, the weight of authority over the country approves price fixing when circumstances point to a public necessity or demand for it. We have found no case to the contrary except Harris v. Duncan, 208 Ga. 561, 67 S.E.2d 692, which is the main reliance of appellant to reverse the judgment appealed from. The dissenting opinion of Mr. Justice McReynolds in Nebbia v. People of State of New York, supra, seems to have been the basis for the Georgia case last cited, both of which are contrary to the universal weight of authority in this country.
Based on the legislative finding and statement of policy prefacing the act assaulted, there is certainly nothing in this case to indicate that the police power was invoked for private purposes or for other than a proper legislative purpose. All of our cases either hold or imply that the power to reasonably regulate the price of a commodity does not necessarily depend on the existence of an economic emergency but may in a proper case be exercised because of the peculiar nature of the problems incident to marketing the commodity. The legislative finding in this case certainly shows that the production and marketing of milk and milk products is of such peculiar nature as to warrant the regulation provided by the act under review. Since Chapter 501 was incorporated in the Revised Statutes of 1941, and in subsequent revisions by amendment in 1947, 1951 and 1953, declining to amend the price fixing powers of the Commission and by refusal to pass the bill introduced in 1955 proposing to repeal the act, the legislature has consistently adhered to its policy that there is continuing need to regulate the milk industry. This court is without power to set at naught an act of the legislature under such circumstances. Board of Supervisors of Elizabeth City County v. State Milk Commission, 1950, 191 Va. 1, 60 S.E.2d 35, 40.
Appellant contends that the only person who profits by price fixing is the national distributor and that the producer and consumer are at his mercy. Hence he says that price fixing can be justified only in case of economic emergency. The answer to this contention is found in the cases cited to be that the legislature may step in and regulate by price fixing when conditions become such that the public is not protected, that the economic condition of large numbers of people is being jeopardized or that unrestricted competition has brought about ruinous conditions in any business. The legislature and not the courts determine when such a condition *323 arises. The courts may review the legislative finding and the measures chosen for administering the act in the public interest, but the trial court found such finding amply supported in this case and nothing has been brought here to warrant us in overthrowing his judgment. We are not confronted with an "inflexible price arrangement" which caused this court in Miles Laboratories v. Eckerd, supra, to strike the non-signer clause of the so-called Fair Trade Act. This is so because the legislature has lawfully delegated to the Commission with reasonable clarity a prescribed standard within which the Commission is free to establish such rules and regulations, and this includes prices of milk sold at wholesale and retail as conditions from time to time warrant. In this connection, it has been stated that a board "`merely exercises the administrative function to effectuate the definitely declared legislative policy.'" State v. Stoddard, supra [126 Conn. 623, 13 A.2d 589]. There is no showing that the Florida Milk Commission is performing its functions in establishing milk prices solely for the benefit of the distributor and to the detriment of the consuming public.
A casual reading of the legislative findings shows that the milk industry had through devious means become a sick business, that an adequate supply of fresh, wholesome milk for the public had become imperiled and that it was necessary for the protection of the public, the consumer and producer to impose rigid restrictions and price fixing. It would be difficult to point out a more convincing case for legislative intervention. We think the findings of the legislature supported by the cases cited herein show conclusively that while the Florida Milk Act was at first an emergency measure, the legislature later found a continued need for it and thereafter from time to time amended it by substituting the act under attack and in 1955 declined to repeal it; that peculiar factors affecting the production and distribution of milk warranted the exercise of the police power in so doing; that the matter was one peculiarly in the discretion of the legislature and there being no showing that it acted arbitrarily or unreasonably, to strike the act down in the face of the factual finding as a predicate for it would be nothing less than substituting our judgment for that of the legislature on a purely legislative matter. The Constitution forbids any such transgression by the court on legislative prerogative.
Summarized in slightly different style  we are confronted with no challenge whatever to the legislative finding. In view of the consistent and persistent legislative history, the fact that the Milk Act was incorporated in the Revised Statutes of 1941 and each subsequent biennial revision to and including 1955, plus the fact that in 1953 the legislature passed Chapter 28137, purporting to strengthen the organizational structure of the Milk Commission, and in 1955 a legislative proposal to abolish the Milk Commission died in committee and never reached the calendar for consideration, it would be contrary to every prohibition in the Constitution defining our tripartite system of government to take over the legislative function and set the Act aside by court decree. Courts should rigidly restrict their activities to those defined by the Constitution.
The judgment appealed from is therefore affirmed.
Affirmed.
DREW, C.J., and HOBSON, ROBERTS, THORNAL and O'CONNELL, JJ., concur.
THOMAS, J., dissents.