### 17687

Greswold GWYNETTE, L. O. Field, Ben Goodale, Fred E. Pearman, Eugene E. Stone, W. S. Smith, J. K. Earle, Jr., R. P. Knapp and W. L. Harrelson, Commissioner of Agriculture, constituting and as the State Dairy Commission, Appellants, v. J. S. MYERS, d/b/a Kash and Karry, Respondent.

(115 S. E. (2d) 673)

*Messrs. Daniel R. McLeod, Attorney General,* and *James S. Verner, Assistant Attorney General,* of Columbia, *for Appellant,*

20

*Messrs. Price & Poag,* of Greenville, *for Respondent,*

*Messrs. Nelson, Mullins & Grier,* of Columbia, *for South Carolina Milk Producer Associations as Amicus Curiae,*

July 26, 1960.

LEGGE, Justice.

The State Dairy Commission, having issued an order declaring the Greenville-Spartanburg market area a "con-

trolled market" and fixing minimum prices to be charged for milk by producers, distributors and retailers in that area, brought this action to enjoin the defendant, a retail grocer of Greenville County, from selling Grade A milk at a price below that so fixed. It appeals from a judgment of the Greenville County Court sustaining a demurrer to its complaint.

The Act of April 27, 1953 (48 Stat. at L. 279), as its preamble shows, was designed to prevent milk of inferior quality being brought into South Carolina from other states during periods of short production of local milk. It divided the state into three zones and provided for the creation of a nine-member State Dairy Commission constituted as follows: one producer from each zone, to be appointed by the Governor from two nominated by the producers in that zone; one distributor from each zone, owning and operating there a milk processing and distributing plant, to be appointed by the Governor from two nominated by the distributors in that zone; two "consumers" appointed by the Governor; and the Commissioner of Agriculture. It forbade the importation of milk into this state for fluid distribution without a permit from the Commission; and it authorized the Commission to make rules and prescribe sanitary standards to be complied with before shipment of milk into this state, "in order to protect the health of the people of South Carolina by guaranteeing a pure supply of milk." Section 10 declared that "nothing contained in this act shall be construed as giving the State Dairy Commission the power to fix, prescribe or control the price or classification of milk or dairy products produced in the State of South Carolina."

The Act of May 11, 1955 (49 Stat. at L. 496) broadened the scope of the Commission's functions and vastly increased its power, giving to it "the authority to supervise and regulate the entire Grade-A milk industry of the State of South Carolina including the production, purchase, transportation, handling, consignment, processing, manufacture, storage,

distribution, bailment, delivery, disposal and sale of milk, cream and milk products in any marketing area in the State of South Carolina." Among other things, it purported to vest in the Commission power, after a public hearing, to declare a state of emergency to exist in any marketing area (to be then designated a "controlled market"), and thereupon to fix the minimum prices to be charged for milk in such area by producers, distributors and retailers.

The complaint in the instant case alleged, inter alia:

That the defendant, operating a large retail store in Greenville County, does not advertise his business by radio, television or newspaper publicity, but instead offers to the public certain "loss-leader" items, among them half-gallon units of milk at thirty-seven cents per unit, which is fourteen cents per unit less than the price charged by other retail merchants and chain stores in the Greenville area, and ten cents per unit below the cost to the defendant; and also quart units at nineteen cents, or seven cents less than the general retail price in that area and five cents less than they cost him; and that as the result of such merchandising efforts over the past several years he has built up a very large business.

"4. That the sale of milk as above stated by the defendant has caused much concern to other retail and chain stores handling milk in the area, which, in order to meet competition, will necessarily have to reduce the price of milk sold by them to a competitive figure, which they have threatened to do and were threatening to do and some were doing prior to the issuance of the Orders of the Commission hereinafter referred to.

"5. That the employees of the Dairy Commission have heretofore called upon the defendant several times and explained to him that his method of operation would certainly disrupt the whole milk market, result in the lowering of prices by his competitors to a point which would cause loss to all parties, and would eventually cause the lowering of milk prices to such extent as to affect and ruin the producers or dairy farmers of South Carolina, who have a great in-

vestment in the business and are without sufficient capital to stand any prolonged price war, which would force them to sell their dairy cattle, close their dairies, and result in the people of South Carolina once more becoming dependent upon foreign sources of supply, at whatever prices such suppliers might charge.

"6. That because of the activities of this defendant, which have existed for years and which he has refused to discontinue after several discussions and requests by the Commission so to do, and because of an imminent price war resulting from his activities as well as the activities and threats of others involved in other phases of the milk business in the market, a public hearing was held in Spartanburg, South Carolina, on the 14th day of July, 1959, after full and proper notice had been given to the public and to all others interested in any and all phases of the milk business. At this hearing some 300 individuals attended and considerable testimony was taken upon the threatening conditions existing in the market and the necessity of price-fixing, the Commission finding that an emergency existed justifying the exercise of its price fixing powers in the Greenville-Spartanburg market, which has been designated by the Commission as Controlled Market No. 1 and consists of these counties: Abbeville, Anderson, Cherokee, Greenville, Greenwood, Laurens, Oconee, Pickens, Spartanburg and Union.

"7. That thereafter the Commission declared the Greenville-Spartanburg market area a controlled market and passed Orders fixing the minimum wholesale, retail and producer prices to be charged for various units of milk by all sellers and buyers of milk, these Orders becoming effective September 1, 1959; the defendant being notified prior to that time to apply for a permit, and of the other requirements of the Orders applicable to him. The prices fixed by these Orders were those generally prevailing at the time in the area and neither raised nor lowered prices, except as to those who were selling as was defendant and others generally conducting activities such as his.

"8. That despite full information and knowledge of the laws, regulations and action of the Commission, upon information and belief, the defendant, on September 1, 1959, through his employee F. H. Vaughn, sold one half-gallon of Grade-A homogenized milk for thirty-seven cents to James A. Merck and threatens to continue such sales at such prices although the minimum price set and fixed by the Commission for such a unit of milk by its Order is set at fifty-one cents."

The primary ground of the demurrer is that the price-fixing provisions of the Act and of the Commission's orders issued by virtue thereof deny the defendant the due process and equal protection guaranteed by Article 1, Section 5 of the Constitution of South Carolina. Stated otherwise, the question is: May the State fix the price at which a retail grocer may sell milk?

To fix the price at which the owner of a thing may sell it is, to that extent, to deprive him of his property; for one's ownership of property consists not only of his right to possess it, but also of his right to use it as he pleases, to sell it at his own price, and to give it away if he wishes to do so. *Rogers-Kent, Inc., v. General Electric Co.,* 231 S. C. 636, 99 S. E. (2d) 665.

The right of a citizen to engage in lawful business, to make contracts, and to dispose of his property, is not absolute; it is subject to regulation and control by the state in the exercise of its police power. But that power, though an essential attribute of sovereignty, is also not absolute; it may be exercised only for the protection of the public in its health, safety, morals or general welfare. *Gasque, Inc. v. Nates,* 191 S. C. 271, 2 S. E. (2d) 36.

Involved here is no question of public health, safety or morals. The issue, as before stated, concerns only the asserted right of the state to fix the minimum price of milk at retail. Beyond doubt, the state has power to regulate and control the price that one in private business

may charge for goods or services where such business is "affected with a public interest." *Munn v. Illinois,* 94 U. S. 113, 24 L. Ed. 77. That, conversely, it may not fix prices in a business not so affected, is manifest not only from the fact that the police power is concerned with public, not private, welfare, but also for the reason that such governmental intermeddling with business essentially private in nature is repugnant to the fundamental concept of free enterprise.

The term "affected with a public interest" is not susceptible of precise definition. In *Wolff Packing Co. v. Court of Industrial Relations,* 262 U. S. 522, 43 S. Ct. 630, 634, 67 L. Ed. 1103, the court classified businesses clothed with a public interest as follows: (1) those operating under a public grant of privileges expressly or impliedly imposing the affirmative duty of rendering a public service upon demand of any member of the public, *e. g.* common carriers and public utilities; (2) certain exceptional occupations which from the early days of the common law have been considered as affected with a public interest, *e. g.* those of operators of inns, cabs, and grist-mills; and (3) those which, though not at their inception, may be fairly said to have been devoted by their owners to the public use. With reference to the third of these classes, the following is clear from that decision:

1. Whether or not the private status of a business, with its attendant freedom from regulation, has changed into one in which the public has such an interest as to justify its regulation by the state, is always a matter for judicial inquiry; the mere declaration by the legislature that a business is affected with a public interest is not conclusive of such inquiry.

2. The extent to which a business affected with a public interest may be regulated by the state is not a matter solely within the legislative discretion. "It depends on the nature of the business on the feature which touches the public, and on the abuses reasonably to be feared."

3. State regulation of the preparation of food may be justified when directed to the health of those employed in that business, or to the health of the public; it may not be extended to the fixing of wages or prices in that industry.

In *Williams v. Standard Oil Co.*, 278 U. S. 235, 49 S. Ct. 115, 116, 73 L. Ed. 287, 60 A. L. R. 596, the court, declaring that Tennessee was without power to fix prices at which gasoline might be sold, said:

"It is settled by recent decisions of this court that a state Legislature is without * * * power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property * * * is 'affected with a pubilc interest.' * * * By repeated decisions of this court, beginning with *Munn v. Illinois*, 94 U. S. 113, 24 L. Ed. 77, that phrase, however it may be characterized, has become the established test by which the legislative power to fix prices of commodities, use of property, or services, must be measured. As applied in particular instances, its meaning may be considered both from an affirmative and a negative point of view. Affirmatively, it means that a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been devoted to a public use and its use thereby in effect granted to the public. * * * Negatively, it does not mean that a business is affected with a public interest merely because it is larger or because the public are warranted in having a feeling of concern in respect of its maintenance."

See also *New State Ice Co. v. Liebmann*, 285 U. S. 262, 52 S. Ct. 371, 374, 76 L. Ed. 747, where the asserted power of Oklahoma to control the business of manufacturing and selling ice was denied, the court declaring that business to be "as essentially private in its nature as the business of the grocer, the dairyman, the butcher, the baker, the shoemaker, or the tailor", and that "the production or sale of food or

clothing cannot be subjected to legislative regulation on the basis of a public use."

For more than half a century after the decision in *Munn v. Illinois* the courts of this country, state and federal, recognized and accepted the principle that a state may not constitutionally fix prices in a private industry not "affected with a public interest." In more recent years, with the spread of the paternalistic tendency to more and more governmental control of private business, that principle has by some courts been ignored or repudiated. In *Nebbia v. People of State of New York,* 291 U. S. 502, 54 S. Ct. 505, 515, 78 L. Ed. 940, 89 A. L. R. 1469, the court, by a five to four decision, upheld a New York statute that vested the Milk Control Board with power, among other things, to fix the minimum price to be charged by a retail grocer for milk sold for consumption off the premises. The price-fixing order there was occasioned by a surplus supply of milk and was designed to prevent smaller distributors, who did not have to carry large quantities of surplus milk, from underselling larger distributors not so fortunately situated. The majority opinion, conceding that the dairy business was neither, a public utility, nor a monopoly, nor a franchise grantee, declared that "the phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good." And again, that " 'affected with a public interest' is the equivalent of 'subject to the exercise of the police power.' " The minority opinion, rejecting this view as both unsound and contrary to long-established precedent, declared:

"Regulation to prevent recognized evils in business has long been upheld as permissible legislative action. But fixation of the price at which A, engaged in an ordinary business, may sell, in order to enable B, a producer, to improve his condition, has not been regarded as within legislative power. This is not regulation, but management, control, dictation— it amounts to the deprivation of the fundamental right which

one has to conduct his own affairs honestly and along customary lines. The argument advanced here would support general prescription of prices for farm products, groceries, shoes, clothing, all the necessities of modern civilization, as well as labor, when some Legislature finds and declares such action advisable and for the public good. This Court has declared that a state may not by legislative fiat convert a private business into a public utility. *Michigan Public Utilities Comm. v. Duke,* 266 U. S. 570, 577, 45 S. Ct. 191, 69 L. Ed. 445, 450, 36 A. L. R. 1105; *Frost Trucking Co. v. Railroad Commission,* 271 U. S. 583, 592, 46 S. Ct. 605, 70 L. Ed. 1101, [1104] 47 A. L. R. 457; *Smith v. Cahoon,* 283 U. S. 553, 563, 51 S. Ct. 582, 75 L. Ed. 1264, [1272]. And if it be now ruled that one dedicates his property to public use whenever he embarks on an enterprise which the Legislature may think it desirable to bring under control, this is but to declare that rights guaranteed by the Constitution exist only so long as supposed public interest does not require their extinction. To adopt such a view, of course, would put an end to liberty under the Constitution."

In *Reynolds v. Milk Commission of Virginia,* 163 Va. 957, 179 S. E. 507, the court, dividing four to three, upheld the licensing and price-fixing provisions of the statute creating the Virginia Milk Commission so far as said provisions and the Commission's orders pursuant to them related to distributors. The majority opinion, leaning upon the *Nebbia case* as authority for the view that the milk industry may be regulated, even to the extent of fixing prices, if the public interest demands it, declared nevertheless that to uphold the issues in the case before it did not require commitment of the court to the broad views expressed by the author of the majority opinion in the *Nebbia case.* See also *Highland Farms Dairy v. Agnew,* 300 U. S. 608, 57 S. Ct. 549, 81 L. Ed. 835, where the Virginia statute was upheld by a divided (five to four) court.

In *H. P. Hood & Sons v. Du Mond,* 336 U. S. 525, 69 S. Ct. 657, 93 L. Ed. 865, the court, again dividing five to

four, struck down, as violative of the Commerce Clause, a New York statute under which the Commissioner of Agriculture and Markets of that state had refused to issue to the appellant, a Massachusetts corporation engaged in distributing milk to the inhabitants of Boston, and having three receiving depots in New York, a license to establish an additional receiving plant, the Commissioner's refusal being upon the ground that issuance of the license would tend to disrupt the economy of other plants in the New York area, to deprive local markets of adequate supply during the short season, and to result in destructive competition in a market already adequately served. It reaffirmed, however, the view of the majority in the *Nebbia case,* that price-fixing for the protection of producers and distributors of milk is within the powers of a state over its internal commerce.

Following the Nebbia decision, the courts of many states have declared valid their statutes creating bureaus for the control of the milk industry and vesting in them power not only to regulate in the interest of the public health, but also to fix prices for the benefit of that industry. *Cf. State Board of Milk Control v. Newark Milk Co.,* 118 N. J. Eq. 504, 179 A. 116; *Noyes v. Erie & Wyoming Farmers Co-operative Corp.,* 281 N. Y. 187, 22 N. E. (2d) 334; *State v. Auclair,* 110 Vt. 147, 4 A. (2d) 107; *Savage v. Martin,* 161 Or. 660, 91 P. (2d) 273; *Schwegmann Brothers Gaint Super Markets v. McCrory,* 237 La. 768, 112 So. (2d) 606. See also *State ex rel. North Carolina Milk Commission v. Galloway,* 249 N. C. 658, 107 S. E. (2d) 631, upholding an order of the North Carolina Milk Commission prescribing a uniform hauling charge per cwt. to be paid to each producer delivering milk to Biltmore Dairy Farms, a processor and distributor, regardless of the volume of milk so delivered or the distance from Biltmore's plant.

> Deeply embedded in our concept of constitutional government is the principle that the state may not dictate prices in a private industry merely because it is large

and important or because the public may be concerned in respect of its maintenance, and that such control is justifiable under the police power only when the industry is affected with a public interest in the sense that it may fairly be said to have been devoted to the public use. To that principle we adhere, agreeing with the opinion of the minority in *Nebbia v. People of State of New York, supra,* which reaffirmed it. The majority opinion in that case, however conclusive as to applicable provisions of the Federal Constitution, does not control us in the interpretation of the Constitution of this state, under which the issue here arises. *Rogers-Kent, Inc. v. General Electric Co., supra.*

It is common knowledge that milk is an essential food; that it is highly perishable in nature; that its wholesomeness is a matter of concern to the public health; that the production and distribution of wholesome milk involves costly sanitary requirements; and that the milk industry in South Carolina is a large and important one. But these characteristics, however they may justify or require governmental regulation for the protection of the people's health, do not render the business so affected with a public interest that as to it the state may prescribe prices for sales by retail stores. Similar characteristics are present in other industries of great importance to this state, e. g., the raising and marketing of beef cattle, the processing and distribution of meat, the growing and marketing of grain, of vegetables, and of fruits, and the handling, processing and sale of fish and other sea foods. Those industries, no less than that concerned with the production and distribution of milk, contribute substantially to the prosperity of this state; and their maintenance is thus a matter in which the people properly have an interest. But, like the milk industry, they are essentially *juris privati;* and we do not think that they may fairly be characterized as "devoted to a public use." *Cf. Wolff Packing Co. v. Court of Industrial Relations, supra* [262 U. S. 522, 43 S. Ct. 633, 67 L. Ed. 1103]. It has never been suggested in this state that the economic security of those engaged in them may be assured by legislative or bureaucratic price-fixing.

The right of the state to regulate and control the production and distribution of milk with regard to sanitation and purity is not in question. The only provision of the Act that is challenged here is that which purports to empower the Commission to dictate to a retail grocer the minimum price at which he may sell wholesome milk that he has purchased from a distributor at the latter's price. In our opinion the police power of the state does not extend so far. We are in accord with the view expressed in *Harris v. Duncan,* 208 Ga. 561, 67 S. E. (2d) 692, 694, where the court, declaring unconstitutional a similar provision of the Georgia Milk Control Law, said:

"While we recognize that milk is an essential food and that a constant and suffcient supply is desirable, or even necessary, yet the same may be said of meat and bread. To let down the barriers of our Constitution and take away the right of contract by seller and purchaser as to milk, might well be applied to other food products. Once the constitutional barrier against infringement upon the right of free contract is down, and the gates become open to products because of their universal use by the public and its concern for a constant and adequate supply thereof, other products such as gasoline, oil, tobacco, clothing, and similar articles could well be the subject for price fixing."

An "emergency" in the Greenville-Spartanburg area is alleged in justification of the Commission's price-fixing orders. Analysis of the complaint discloses as the factual basis for declaration of an emergency nothing more or less than that the defendant, a retail grocer, in order to attract customers to his store, has for several years been selling milk below the retail price prevailing in the Greenville-Spartanburg area; that this has caused "much concern" to other retail merchants in the area, some of whom have reduced and others of whom "will necessarily have to reduce the price of milk sold by them to a competitive figure;" that this practice "would eventually cause the lowering of milk prices to such extent as to affect and ruin the producers

or dairy farmers of South Carolina * * * and result in the people of South Carolina once more becoming dependent upon foreign sources of supply * * *." There is no suggestion that any producer or distributor has yet been forced to reduce his price a penny as the result of the defendant's "loss-leader" practice; nor is it suggested that the defendant or any other retailer in the area is presently unwilling to pay the price now being charged by the distributors or is buying from out-of-state sources. Upon the facts alleged, the "emergency" would seem more fancied than real

We reject the thought, suggested by the allegations of the complaint just quoted, that the "emergency" contemplated by the Commission was the possibility of importation from other states of milk more cheaply purchased, and that the price-fixing orders were designed to protect local economic interests from interstate competition. For such a purpose would not support the orders in question even under the view that a state may fix prices in the milk industry within its borders. As Mr. Justice Cardozo, speaking for a unanimous court in *Baldwin v. G. A. F. Seelig, Inc.,* 294 U. S. 511, 55 S. Ct. 497, 500, 79 L. Ed. 1032, 101 A. L. R. 55, said of a provision in the New York Milk Control Act purporting to forbid the sale in that state of milk bought outside unless the price paid to the producer was one that would be lawful upon a like transaction within the state:

"Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported. * * * Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents."

Another reason shuts our ears to the cry of "emergency" in this case. An emergency, however it may furnish occasion for the exercise of existing power, does not itself create

power. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U. S. 579, 72 S. Ct. 863, 96 L. Ed. 1153, 26 A. L. R. (2d) 1378. The Commission, being without power to fix prices before the alleged emergency, acquired no potency in that field because of it.

Affirmed.

TAYLOR and Moss, JJ., concur.

OXNER, Justice (dissenting).

While the question is a difficult one, I am not persuaded beyond a reasonable doubt that our Constitution forbids the legislature from controlling the price at which milk may be sold. We have repeatedly said that every presumption will be made in favor of the constitutionality of a legislative enactment and that a statute will be declared unconstitutional "only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution." *Moseley v. Welch,* 209 S. C. 19, 39 S. E. (2d) 133, 137.

The preamble to the Act reads:

"Whereas, approximately ninety per cent of the fluid milk sold in the United States is either under state or federal price control; and,

"Whereas, all states bordering on South Carolina have some control over milk pricing, the following findings of fact with respect to the dairy industry are hereby made:

"1. Milk is referred to by all authorities on human nutrition as 'nature's most nearly perfect human food.'

"2. Because of its highly perishable nature, its production and distribution have been surrounded by more costly sanitary requirements than those of any other commodity.

"3. Milk cannot be kept in constant and adequate supply for consumers unless the high cost of maintaining these sanitary precautions is returned to producers.

"4. Dairy farming fits logically into our modern agricultural diversification program and is contributing substantially to the agricultural and industrial stability of the State.

"5. The perishable nature of milk, the necessity for immediate disposition and delivery by the producer, the seasonal effects on production, and the variations in consumption, make it advisable to find markets and use in seasons of excess production, and to take such steps as are found expedient to stabilize the industry in areas affected by adverse conditions.

"6. The present Dairy Commission does not have the power to prevent price wars, unfair trade practices and chaotic marketing conditions with their attendant consequences to producers, distributors and consumers.

"7. The General Assembly finds that the enactment of this legislation will be of benefit to the producers, distributors and consumers of dairy products and the public generally."

The foregoing facts are presumptively correct and must be accepted if the law-making body could have rationally believed them to exist. *Richards v. City of Columbia,* 227 S. C. 538, 88 S. E. (2d) 683; *Mills Mill v. Hawkins,* 232 S. C. 515, 103 S. E. (2d) 14.

It is apparent from the foregoing findings that the Legislature concluded that the milk industry is affected by elements of instability peculiar to the business, necessitating special control, and sought to invoke the police power for the protection of the health, safety and welfare of the general public, as well as the welfare of those engaged in the milk industry.

Legislation having the same paramount purpose has been enacted in a number of States and sustained by every court that has considered it except one. The first decision was *People v. Nebbia,* 1933, 262 N. Y. 259, 186 N. E. 694. In that case the Court upheld a New York statute drastically regulating the milk industry, including the price at which milk might be sold by stores to consumers. The enactment of this legislation resulted from an extensive legislative investigation which disclosed destructive and demoralizing com-

petitive conditions and unfair trade practices in the milk industry causing the income of the farmers to be reduced below the cost of production and endangering the supply of pure and wholesome milk. This decision was affirmed by the United States Supreme Court in *Nebbia v. People of State of New York,* 1934, 291 U. S. 502, 54 S. Ct. 505, 510, 78 L. Ed. 940, 89 A. L. R. 1469. It was there held that the price fixing features of this statute did not constitute a denial of the equal protection of the laws or due process guaranteed by the Fourteenth Amendment. Mr. Justice Roberts, speaking for the majority of the Court, pointed out that neither property rights nor contract rights are absolute and that the guaranty of due process "demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." In the course of the opinion, it was said: "We may as well say at once that the dairy industry is not, in the accepted sense of the phrase, a public utility. We think the appellant is also right in asserting that there is in this case no suggestion of any monopoly or monopolistic practice. It goes without saying that those engaged in the business are in no way dependent upon public grants or franchises for the privilege of conducting their activities. But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle. The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago." The Court concluded: "If the law-making body within its

sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

In *H. P. Hood & Sons v. Du Mond,* 336 U. S. 525, 69 S. Ct. 657, 660, 93 L. Ed. 865, it is said: "Production and distribution of milk are so intimately related to public health and welfare that the need for regulation to protect those interests has long been recognized and is, from a constitutional standpoint, hardly controversial. Also, the economy of the industry is so eccentric that economic controls have been found at once necessary and difficult. These have evolved detailed, intricate and comprehensive regulations, including price-fixing. They have been much litigated but were generally sustained by this Court as within the powers of the State over its internal commerce as against the claim that they violated the Fourteenth Amendment."

Also, see *Hegeman Farms Corporation v. Baldwin,* 293 U. S. 163, 55 S. Ct. 7, 79 L. Ed. 259; *Borden's Farm Products Co. v. Ten Eyck,* 297 U. S. 251, 56 S. Ct. 453, 80 L.

Ed. 669; *Highland Farms Dairy v. Agnew*, 300 U. S. 608, 57 S. Ct. 549, 81 L. Ed. 835.

The right of a State to control the price at which milk may be sold has been sustained by the following State courts: *Franklin v. State ex rel. Alabama State Milk Control Board*, 1936, 232 Ala. 637, 169 So. 295; *Jersey Maid Milk Products Co. v. Brock*, 1939, 13 Cal. (2d) 620, 91 P. (2d) 577; *State v. Stoddard*, 1940, 126 Conn. 623, 13 A. (2d) 586; *Shiver v. Lee, Fla.* 1956, 89 So. (2d) 318; *Albert v. Milk Control Board*, 1936, 210 Ind. 283, 200 N. E. 688; *Schwegmann Brothers Giant Super Markets v. McCrory*, 1959, 237 La. 768, 112 So. (2d) 606; *Johnson v. Michigan Milk Marketing Board*, 1940, 295 Mich. 644, 295 N. W. 346; *State ex rel. North Carolina Milk Commission v. Galloway*, 1959, 249 N. C. 658, 107 S. E. (2d) 631; *In re Opinion of the Justices*, 1937, 88 N. H. 497, 190 A. 713; *State ex rel. State Board of Milk Control v. Newark Milk Co.*, 1935, 118 N. J. Eq. 504, 179 A. 116; *Savage v. Martin*, 1939, 161 Or. 660, 91 P. (2d) 273; *Rohrer v. Milk Control Board*, 1936, 322 Pa. 257, 186 A. 336; *State v. Auclair*, 1939, 110 Vt. 147, 4 A. (2d) 107; *Reynolds v. Milk Commission of Virginia*, 1935, 163 Va. 957, 179 S. E. 507; *State ex rel. Finnegan v. Lincoln Dairy Co.*, 1936, 221 Wis. 1, 265 N. W. 197, 851.

The only decision that we have found to the contrary is *Harris v. Duncan*, 1951, 208 Ga. 561, 67 S. E. (2d) 692.

In all of these cases the unique nature of the milk industry in relation to the health and general welfare of the people is emphasized. In *Savage v. Martin, supra,* 161 Or. 660, 91 P. (2d) 273, 281, the Court said: "Laws prescribing minimum prices for milk are justified by the courts on the ground, among others, that the industry is not only a basic one, which merely concerns the economic welfare and the health of the people, but also a unique one. The public need is for a constant daily supply of pure wholesome milk. In certain markets the demand fluctuates as does the supply. Milk is a highly perishable product which cannot be stored, but must

be sold as fluid milk within a few hours after it is produced; otherwise, it is disposed of in factory channels at lower prices."

Substantially the same view is expressed in *Shiver v. Lee,* Fla., 89 So. (2d) 318, 322, *supra,* as follows: "Milk is perishable and cannot long be stored; it is an excellent host for bacteria; it is essential to a balanced diet; babies could not subsist without it, in fact it is their primary medium of diet for the first year and it is settled that it is essential to the health of adults."

In *Rohrer v. Milk Control Board, supra,* 322 Pa. 257, 186 A. 336, 340, the Court said: "The milk industry is not only absolutely vital to the health and well-being of the whole people, and especially growing children, but it is also unique and in a class by itself, because (1) milk cannot be kept by the producer, but must be delivered to the dealer within twenty-four hours of production; (2) the supply must exceed the demand by a reasonable margin in order to provide for emergencies, and this excess over the normal demand be put to less profitable uses and consequently paid for at a smaller price; (3) the method of payment is based on how it is utilized by the dealer, who reports to the producer the uses made of it; (4) it must be handled with the utmost care from start to finish, and is hedged about by a host of sanitary regulations, for the protection of the public, because it is a most fertile field for the growth of bacteria. These facts make the dairy farmer or producer dependent for his return on the use to which the dealer to whom he delivers it puts it. His commodity and the price he receives for it are so far out of his control that, as a matter of fact, his supposed freedom of contract is largely illusory and at the mercy of the dealer unless the Legislature intervenes for his protection; not primarily for his benefit, but only secondarily or incidental to the main purpose of promoting the public welfare by seeing to it that an adequate supply of pure milk is available at a price reasonable to the public, the dealer, and the producer."

In view of the peculiar characteristics of the milk industry and its relation to the health and public welfare of the people, I do not think legislative price fixing manifestly and plainly constitutes a denial of either the equal protection clause or the due process clause of our Constitution. It is true that in *Rogers-Kent, Inc. v. General Electric Co.,* 231 S. C. 636, 99 S. E. (2d) 665, 669, we declined to "follow the crowd" and held our "Fair Trade Act" unconstitutional. But as there pointed out, the Act applied to every product bearing the trademark, brand or name of the producer with no distinction between commodities affected with a public interest and those that were not. I am still of the opinion that a general price fixing statute is obnoxious to the constitutional guaranty of due process of law. But here I think it may be reasonably said that the Act under consideration has a real and substantial relation to the health and welfare of the general public.

It is suggested that if this Act is upheld, the Legislature could authorize prices to be fixed on meat, flour, fish, vegetables or any other article of food. Apprehension of a somewhat similar nature has been expressed before. See the dissenting opinion of Mr. Justice Field in *Munn v. Illinois,* 94 U. S. 113, 24 L. Ed. 77. But we are not now called upon to determine what other articles of food, if any, are so "affected with a public interest" as to justify price fixing by statute. As pointed out by Mr. Justice Roberts in *Nebbia v. People of State of New York, supra,* 291 U. S. 502, 54 S. Ct. 505, 511, 78 L. Ed. 940, 89 A. L. R. 1469, "a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts."

It is interesting to note that the Supreme Court of California after sustaining a statute similar to the one now under attack, held invalid a statute authorizing a board to establish minimum price schedules for cleaning, dyeing and pressing services. *State Board of Dry Cleaners v. Thrift-D-Lux*

*Cleaners,* 40 Cal. (2d) 436, 254 P. (2d) 29. And although the Supreme Court of Indiana had held that the Legislature of that State could fix prices at which milk might be sold, it held invalid a statute authorizing a State Board to fix minimum prices for barber service. *State Board of Barber Examiners v. Cloud,* 220 Ind. 552, 44 N. E. (2d) 972. In both of these decisions the milk cases were distinguished.

General recognition seems to have been given by the learned County Judge to some of the views herein expressed when he said that "production and distribution of milk are reasonably related to public health and welfare." But he concluded that price controls at the retail level "are not reasonably related to or required by the interest of the producers, distributors or the public." He stated in his order: "When the store operator purchases from the distributor at the established wholesale prices, and the producer ʀeceives from the distributor the price fixed and required by the Act, it is difficult to see how the interest of either, or of the public at large thereafter can be prejudiced or threatened by the store operator selling at such prices as they should see fit."

The Legislature evidently concluded that the price at which milk was sold at retail was inseparably connected with the evil sought to be remedied. I cannot say that such a conclusion is unreasonable or arbitrary. Most of the statutes of the other States include price fixing at the retail level. But in none of the cases sustaining them is there any recognition of the distinction made by the Court below. Such a vital consideration could not have been overlooked. The writer of the majority opinion in this case evidently concluded that in so far as the public interest was concerned, there was no distinction in principle between fixing prices at retail and at wholesale, for no reference is made to it in the opinion.

The wisdom of fixing the price of milk either at the wholesale or the retail level may from an economic standpoint be debatable. But here we are only concerned with the power of the Legislature and not whether such power should be exercised.

If I am correct in my view that the Legislature may control the price of milk, there is no doubt that such authority may be delegated to an administrative agency provided the Legislature fixes adequate standards by which such agency is to be governed or lays down a well defined and intelligent principle to which such agency must conform. *South Carolina State Highway Department v. Harbin,* 226 S. C. 585, 86 S. E. (2d) 466. The question as to whether the statute under consideration establishes an adequate standard to govern the Dairy Commission in fixing prices at retail is not included in the grounds of demurrer and I intimate no opinion thereabout. Cp. *State v. Stoddard, supra,* 126 Conn. 623, 13 A. (2d) 586.

It is also suggested that the allegations of the complaint disclose no necessity for price fixing in the instant case. But I think this should be determined on the trial of the case.

I would overrule the demurrer.

STUKES, C. J., concurs.